## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHPOINT RESOURCES CORP., *et al.*,[1] | ) | Case No. 21-10565 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF WILLIAM M. CRAWFORD,
## CHIEF FINANCIAL OFFICER OF HIGHPOINT RESOURCES CORPORATION,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, William M. Crawford, hereby declare under penalty of perjury:

### Introduction

1.     HighPoint Resources Corporation is a leading public oil and gas company that focuses primarily on exploration, development, and production in the DJ Basin located in eastern Colorado.  HighPoint, like many of its peers faced unprecedented challenges in 2020 in the face of the global pandemic and OPEC/Russia tensions that created low oil prices and this put immense pressure on HighPoint's capital structure, including $765 million of indebtedness. But unlike most of its peers that have previously succumbed to these pressures and commenced chapter 11 cases, HighPoint proactive approach has put it in a unique position to creatively maximize value.

2.     More specifically, HighPoint engaged in extensive marketing and negotiations with multiple interested parties during Q3 and Q4 of 2020.  These negotiations resulted in a transaction that contemplates a merger with Bonanza Creek Energy—another oil and gas company with assets in the DJ Basin—and the consensual equitization of approximately $625 million of unsecured

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HighPoint Resources Corporation (0361); HighPoint Operating Corporation (0545); and Fifth Pocket Production, LLC (8360).  The location of the Debtors' principal place of business is 555 17th Street, Suite 3700 Denver, Colorado 80202.

notes.  HighPoint November 2020, Bonanza Creek, holders of 86% of HighPoint's unsecured notes, and holders of 46.5% of the Debtors' publicly-traded equity entered into definitive agreements to effectuate the business combination and deleveraging transactions.  Since that time, the Debtors and Bonanza Creek worked closely with the Securities and Exchange Commission to launch a dual-track solicitation processes in accordance with applicable securities laws.  As a result of these efforts, the Plan now enjoys overwhelming support, and these chapter 11 cases are the final step in implementing this highly creative transaction.

3.      Holders of Allowed Notes Claims[2] will own approximately 30.4 percent in the aggregate, and Holders of Allowed Existing HPR Interests will own approximately 1.6 percent in the aggregate, of BCEI Common Stock on a fully-diluted basis after giving effect to the Merger and the Plan.[3]  Holders of Allowed Notes Claims will also receive their Pro Rata share of $100 million of New Take Back Notes in the combined company.  All other creditors are Unimpaired under the Plan, and all of HighPoint's general unsecured creditors will be paid in full.

4.      Holders of Allowed Notes Claims and Allowed Existing HPR Interests have voted overwhelmingly in favor of the Plan.

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | NUMBER | AMOUNT | NUMBER | AMOUNT |
| **Class 4 Notes Claims** | 105 **90.52%** | $529,250,000 **99.38%** | 11 **9.4%** | $3,278,000 **0.62%** |
| **Class 8 Existing HPR Interests** | | 2,314,636.11 **99.17%** | | 19,358 **0.83%** |

---

[2]    Capitalized terms used but not otherwise defined in this Declaration shall have the meaning ascribed to such terms in the Plan.

[3]    In each case based on the number of shares of BCEI Common Stock outstanding as of November 9, 2020. Bonanza shareholders will own approximately 62 percent of the combined company.

5.    Given that the Plan has been accepted by more than 99 percent of creditors and equity holders that submitted a ballot and pays all other allowed claims in full, a prolonged stay in chapter 11 is not only unnecessary but would result in unnecessary incremental administrative costs.  The Debtors took extensive measures to ensure that all parties in interest have had sufficient notice of the proposed Plan, the Objection Deadline, and the Combined Hearing, consistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable nonbankruptcy law in advance of the commencement of these chapter 11 cases.  On November 9, 2020, the Debtors publicly disclosed a substantially final draft of the Plan via 8-K—more than *four months* before the Petition Date.  On December 17, 2020, the Debtors publicly disclosed a substantially final draft of the disclosure statement in support of the Plan (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") via the Registration Statements— approximately *three months* before the Petition Date.  On February 9, 2021, the Securities and Exchange Commission completed its review of the Registration Statements and declared them effective.   On February 10, 2021—32 days in advance of the Petition Date—the Debtors commenced solicitation of their unsecured bondholders and equity holders.  That same day, the Debtors served approximately 5,000 creditors and interested parties, and posted the Plan, Disclosure Statement, and Combined Notice on Highpoint's proposed notice and claims agent's website.

6.    The Debtors proposed timeline respects all necessary notice periods.  The Debtors have taken all appropriate procedural steps to provide sufficient notice to all stakeholders of its bankruptcy and the confirmation process, and no party in interest has objected.  The Debtors' comprehensive noticing process is the principal basis upon which they are seeking to confirm the Plan within four days of the Petition Date.

| Date | Document(s) | Parties | Service |
|------|-------------|---------|---------|

| February 10, 2021 | Solicitation Package | Voting Classes | Email and Hard Copy Mailing |
|---|---|---|---|
| | Combined Notice | ~5,000 creditors and interested parties | Hard Copy Mailing |
| | Combined Notice, Plan, and Disclosure Statement | Available to General Public | Posted to the Claim and Noticing Agent's Website |
| February 16, 2021 | Combined Notice | Available to General Public | Published in *The New York Times* |
| | Combined Notice | Available to General Public | Published in *The Denver Post* |
| March, 2, 2021 | Proposed Pleadings | Available to General Public | Posted to the Claim and Noticing Agent's Website |
| | Notice of Proposed Pleadings | ~5,000 creditors and interested parties | Hard Copy Mailing |
| March  4, 2021 | Plan Supplement | Available to General Public | Posted to the Claim and Noticing Agent's Website |
| | Notice of Plan Supplement | ~5,000 creditors and interested parties | Hard Copy Mailing |
| March  4, 2021 | Cure Schedule | Available to General Public | Posted to the Claim and Noticing Agent's Website |
| | Custom Cure Notices | ~ 400 counterparties to Executory Contracts and Unexpired Leases | Hard Copy Mailing |

7.      The Debtors are poised to confirm a highly consensual and creative value-maximizing business combination and balance-sheet restructuring.  The Plan is the culmination of a full and fair process that delivers the best available result to the Debtors' stakeholders.  Due process has been respected at every step of the way.  Therefore, the Debtors respectfully request that the Court grant the relief requested in the First Day Motions, approve the Disclosure Statement and confirm the Plan.

**Background**

8.      I serve as Chief Financial Officer of HighPoint Resources Corporation ("HighPoint"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (together with HighPoint, collectively, the "Debtors").  I have been with HighPoint since 2004. I have been serving as the Debtors' Chief Financial Officer since 2018, and previously served as Senior Vice President – Treasury and Finance from February 2009

to May 2018 and Vice President – Finance and Marketing from February 2009 to February 2016. I hold a bachelor of science in accounting from Colorado State University.

9.      In my capacity as Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above eighteen years of age and I am competent to testify.

10.      I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances that lead to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications described herein (collectively, the "First Day Motions"), each of which is filed contemporaneously herewith.  The First Day Motions seek relief to allow the Debtors to meet their critical and necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and all stakeholders' interests. The facts set forth in each First Day Motion are incorporated herein by reference.

11.      I have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the negotiations of the Merger Agreement (as defined herein) dated November 9, 2020, the Transaction Support Agreement dated November 9, 2020 (the "TSA"), the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or otherwise modified from time to time, the "Plan"), and the transactions contemplated thereunder.

12.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon  my personal knowledge of the Debtors' employees, operations, and finances; information

learned from my review of relevant documents; information supplied to me by other members of the Debtors' management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

13.    To familiarize the Court with the Debtors and their enterprise, I submit this Declaration. This Declaration is organized into four sections. *Part I* provides a general overview of the Debtors' business, corporate history, and corporate structure. *Part II* details the Debtors' prepetition capital structure. *Part III* describes the Debtors' prepetition restructuring efforts, the events and circumstances leading to the filing of these chapter 11 cases, the key terms of the Plan, the TSA and the Merger Agreement, and the proposed timeline for these chapter 11 cases. *Part IV* summarizes the relief requested in and the legal and factual basis that support the First Day Motions.

## Debtors' History and Business Operations.

**I.    The Debtors' Corporate History and Corporate Structure.**

14.    Headquartered in Denver, Colorado, the Debtors employ approximately 130 people. The Debtors' operating revenue for the twelve-month period that ended December 31, 2020, was approximately $250 million. The Debtors have approximately $779 million in total funded debt obligations.

15.    HighPoint was founded in January 2002 by William "Bill" Barrett as "Bill Barrett Corporation". Bill Barrett Corporation began active exploration and development of oil and natural gas in the Rocky Mountain region in March 2002. In 2004, Bill Barrett Corporation became a public company as part of its initial public offering on the NYSE. On March 19, 2018, HighPoint Resources Corporation was formed and became the successor to Bill Barrett

6

Corporation, following a merger between Bill Barrett Corporation and Fifth Creek Energy Operating Company, LLC ("Fifth Creek"). As a result of this merger, Bill Barrett Corporation became a wholly-owned subsidiary of HighPoint Resources Corporation and subsequently changed its name to HighPoint Operating Corporation.

The chart below depicts the Debtors' prepetition corporate structure.



## II.     The Debtors' Key Assets and Operations.

16.     The Debtors have built a strong asset base through a combination of property acquisitions, development of reserves, and exploration activities. The Debtors have consistently maintained a high degree of operational control over their lease  development and producing wells under the belief that retaining control of production enables a lower operating cost structure, lower well costs, improves drilling performance and increases ultimate hydrocarbon recovery through optimization of drilling and completion techniques. In addition, operating their production allows the Debtors to more efficiently manage the pace of

their horizontal development program and the gathering and marketing of their production.  The Debtors have sought to continuously monitor and adjust their drilling program with the objective of achieving the highest total returns on their portfolio of drilling opportunities.  As the Debtors' acreage and production expanded, they proactively sought to secure the necessary midstream and associated operational infrastructure to support their drilling schedule and keep pace with their expected production profile.

A.    **The Debtors' Assets and Operations.**

17.    The Debtors' assets and current operations are nearly entirely focused on the DJ Basin located in eastern Colorado and southeastern Wyoming.  The DJ Basin is an established area where the Debtors focus on optimizing and scaling their development programs targeted at the Niobrara and Codell formations, and employing new technologies to optimize oil recoveries and economic returns.  Through the merger with Fifth Creek, HighPoint acquired additional acreage in Hereford field, which is located in the northern portion of the DJ Basin.



Note: Green boundaries outline municipality limits

### B.    The Debtors' Industry.

18.    The vast majority of the Debtors' assets are in the upstream sector of the oil and

gas industry, which is comprised of E&P activities that focus on locating and extracting crude oil,

raw natural gas, and other hydrocarbons from underground.  Common upstream assets include

wells and simple well pad equipment.  The Debtors focus on the acquisition, exploration,

development, and production of crude oil, natural gas, and NGLs.  Although the Debtors also

engage in certain in-field functions such as compression, gathering, processing, and marketing (as

well as the ownership and operation of certain salt water disposal wells)—which are typically

characterized as mid-stream or downstream activities—the Debtors consider such functions to be ancillary to their upstream E&P activities.

### C.    Marketing Contracts.

19.    HighPoint markets all of its produced oil and sells to a variety of purchasers under contracts priced off the New York Mercantile Exchange.  As is customary in the upstream E&P type of business, HighPoint sells its oil to a relatively small number of customers.  In 2019, three customers, each individually accounted for more than 10 percent of the Debtors' revenues.

20.    Because the Debtors' oil and natural gas production from their operated properties is sold under market priced agreements, the Debtors are positioned to take advantage of future increases in oil and natural gas prices but are also subject to any future price declines. This potential volatility is partially offset through hedging arrangements, as discussed further herein.

### Debtors' Prepetition Capital Structure.

21.    As of December 31, 2020, the Debtors had approximately $765 million in aggregate outstanding principal of funded debt obligations, as reflected  in more detail below:

| Funded Debt | Maturity | Outstanding Principal Amount as of December 31, 2020 |
|---|---|---|
| **Secured Debt** | | |
| RBL Facility | July 16, 2022 | $140,000,000 |
| | **Total Secured Debt** | $140,000,000 |
| | | |
| **Unsecured Debt** | | |
| 7% Notes | October 15, 2022 | $350,000,000 |
| 8.75% Notes | June 15, 2025 | $275,000,000 |
| | **Total Unsecured Debt** | $625,000,000 |
| | | |
| | **Total Funded Debt** | $765,000,000 |

A.    **The RBL Facility.**

22.    On September 14, 2018, the Debtors entered into a fourth amended and restated credit facility (the "RBL Facility"), which, among other things, provides for a maximum credit amount of $1.5 billion, an initial elected commitment amount of $500 million and an initial borrowing base of $500 million subject to semiannual redetermination.  On May 21, 2020, following a semiannual redetermination, the RBL Facility aggregate elected commitment amount and borrowing base were both reduced from $500 million to $300 million and the applicable margins for interest and commitment fee rates were increased.  In addition, provisions were added requiring the availability under the RBL Facility to be at least $50 million and the Debtors' weekly cash balance (subject to certain exceptions), not exceed $35 million.  On November 2, 2020, the aggregate elected commitment amount was further reduced from $300 million to $185 million and the borrowing base was reduced to $200 million, subject to further adjustment.  In addition, this amendment eliminated a minimum availability requirement for borrowings under the RBL Facility and made changes to certain covenants.

23.    While the stated maturity date of the RBL Facility is September 14, 2023, the RBL Facility is subject to a springing maturity date if the Debtors have more than $100 million of "Permitted Debt" or "Permitted Refinancing Debt" (as those terms are defined in the RBL Facility) that matures prior to December 14, 2023.  Under those circumstances, the maturity date is 91 days prior to the earliest maturity of such Permitted Debt or Permitted Refinancing Debt.  Currently, because the 7% Notes will mature on October 15, 2022, the aggregate amount of those notes exceeds $100 million and the notes constitute "Permitted Debt," the maturity date specified in the RBL Facility is the date that is 91 days prior to the maturity date of the 7% Notes, or July 16, 2022.

24.    As of the Petition Date, there were approximately $155 million in outstanding borrowings under the RBL Facility.  In addition to outstanding borrowings, as of the Petition Date,

there is approximately $17 million in secured letters of credit as issued but undrawn under the RBL Facility.

**B.    7% Notes**

25.    Pursuant to the 7% Notes Indenture, the Debtors issued the 7% Notes in an aggregate principal amount of $350 million.  The 7% Notes mature on October 15, 2022.  Interest is payable on the 7% Notes on April 15 and October 15 of each year.  The 7% Notes are senior unsecured obligations ranking equal in right of payment with all of the Debtors' other existing and future senior indebtedness, including the 8.75% Notes, and effectively subordinated to the Debtors' secured debt, to the extent of the value securing such debt.

26.    As of the Petition Date, the 7% Notes have approximately $350 million of aggregate principal outstanding.

**C.    8.75% Notes**

27.    Pursuant to the 8.75% Notes Indenture, the Debtors issued the 8.75% Notes in an aggregate principal amount of $275 million.  The 8.75% Notes mature on June 15, 2025.  Interest is payable on the 8.75% Notes on June 15 and December 15 of each year.  The 8.75% Notes are senior unsecured obligations ranking equal in right of payment with all of the Debtors' other existing and future senior indebtedness, including the 7% Notes, and effectively subordinated to the Debtors' secured debt, to the extent of the value securing such debt.

28.    As of the Petition Date, the 8.75% Notes have approximately $275 million of aggregate principal outstanding.

**D.    Derivatives and Hedging Activities**

29.    To provide protection against volatility in commodity prices, the Debtors have historically entered into hedging transactions covering a portion of the Debtors' anticipated production levels.  The Debtors' hedging transactions have primarily consisted of financially-

settled crude oil and natural gas option contracts—generally compromised of a mixture of costless collars and swaps—with 7 financial institutions, all of which are lenders under the RBL Facility, or affiliates of RBL lenders.  For the year ended December 31, 2020, approximately 91% of the Debtors' oil production over this period was hedged by derivative contracts.  As of December 31, 2020, the Debtors' derivative contracts represented a net asset of approximately $18.477 million on a mark-to-market basis. As of February 4, 2021, the Debtors had hedged 3,098,000 barrels and 365,000 barrels of our expected 2021 and 2022 oil production, respectively, and 7,590,000 mmbtu and 3,650,000 mmbtu of their expected 2021 and 2022 natural gas production, respectively, at price levels that provide some economic certainty to our cash flows.

30.     Before the commencement of these chapter 11 cases, the Debtors and BCEI engaged with their hedge agreements counterparties, to ensure smooth consummation of the Merger as it relates to the hedge agreements.  These negotiations resulted in agreements pursuant to which each of the seven hedge arrangements will be novated from HighPoint to the combined company upon closing of the Merger and occurrence of the Effective Date.

**E.     Shareholder Equity.**

31.     On October 30, 2020, HighPoint effected a 1-for-50 reverse stock split of its common stock.  As of the date hereof, there are approximately 8,000,000 shares authorized and 4,305,252 outstanding with a par value of $0.001.  HighPoint's common stock trades on the NYSE under the ticker symbol "HPR". BCEI's common stock trades on the NYSE under the ticker symbol "BCEI".

**III.   Events Leading to the Chapter 11 Filing.**

**A.     Liquidity Challenges Due to Recent Market Volatility and March 2020 Oil Market Crash.**

32.     The difficulties initially faced in 2020 by the Debtors are consistent with those industry-wide.  Volatile market conditions have challenged oil and gas companies and others for

years.  From January 1, 2014 until April 20, 2020, WTI crude oil prices ranged from a high of $107.26 per barrel to a low of -$37.63 per barrel.  During that same period Henry Hub natural gas prices ranged from a high of $6.15 per mmbtu to a low of $1.55 per mmbtu.

33.    In early 2020, the initial spread of COVID-19 caused decreased factory output and transportation demand, resulting in a decline in energy prices.  To address this, OPEC, led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia.  Those initial efforts faltered, and the parties failed to reach an agreement on production levels.  Instead, both the Kingdom of Saudi Arabia and Russia announced that they would increase, rather than decrease, production, resulting in surplus supply amidst already decreasing demand for energy.  Meanwhile, the COVID-19 pandemic continued to spread, causing governments across the world to institute strict public health and safety measures, including stay-at-home orders that have further decreased energy demand. On April 12, 2020, in an effort to relieve some of the negative impacts on the industry, 23 countries agreed to commit to withholding 9.7 million barrels of oil per day from the global markets.  That agreement, however, was not enough to counteract the combined effects of the initial price war and the decreased demand due to COVID-19.

34.    The corresponding effects on energy markets have been severe.  In March 2020, oil prices plummeted to near $20 per barrel, which was the lowest in nearly twenty years until April 20, 2020, when the West Texas Intermediate ("WTI")—the benchmark for U.S.-based oil exploration and production companies—settled at a negative price for the first time in history.

*WTI Crude May 2020 Contracts*



35.     The effect of recent events on companies in the oil and gas industry (not just E&P companies) has been undeniable.  Independent oil and gas companies such as HighPoint have been especially hard hit, as their revenues are primarily generated from the sale of oil, natural gas, and NGLs.  Making matters worse, the drastic decrease in demand and corresponding over-supply of oil, natural gas and NGLs led to an unprecedented storage shortage.  Oil and gas companies were left with no option but to consider well shut-ins and other production measures to address the impending storage issue.

36.     The current volatility in commodity markets has made it especially difficult for some companies to execute on out-of-court restructuring alternatives.  For example, in 2020, at least 43 E&P companies filed for chapter 11.

**B.      Borrowing Base Redeterminations.**

37.     The Company's borrowing base is subject to semiannual redetermination under the RBL Facility.  Certain considerations including commodity prices, operations, reserve amounts, and regulations, among other things, impact the amount of the borrowing base each redetermination period.  On May 21, 2020, the Company received the results of the first

semiannual redetermination, resulting in the reduction of the borrowing base commitment from approximately $500 million to approximately $300 million.  On November 2, 2020, following the second semiannual redetermination, the borrowing base was further reduced to $200 million, with elected commitments reduced to $185 million.  Combined with the other financial and operational challenges described herein, these borrowing base redeterminations further strained the Debtors' liquidity and challenged the sustainability of the Debtors' capital structure.

      C.     **Retention of Advisors.**

38.     Despite the Debtors' efforts to mitigate the financial strain brought on by adverse market conditions through non-core asset divestitures and operational "rightsizing," the Debtors' liquidity position remained strained and was projected to be insufficient over the long term to fund the capital intensive nature of their business and service its leveraged capital structure.  To facilitate a broader capital structure solution, in April 2020, the Debtors engaged advisors—including Tudor Pickering Holt & Co Advisors LP and its affiliates, including Perella Weinberg Partners (collectively, "TPH-PWP") as financial advisors and Kirkland & Ellis LLP as legal advisors—to, among other things, help prepare for and respond to challenges arising from the deterioration in commodity prices, address their liquidity concerns and maturity profile, and assess strategic alternatives.  In October 2020, the Debtors engaged AlixPartners, LLP as restructuring advisor to assist with any such transaction.

      D.     **Stakeholder Discussions, the TSA, and the Merger Agreement.**

39.     The Debtors' board, together with the Debtors' executive management, in the ordinary course and consistent with their fiduciary duties, regularly reviews and assesses the Debtors' strategic options.  Beginning in late 2019, this process took on increased urgency given structural changes in the oil and gas industry described herein, HighPoint's limited and reduced access to capital markets and lower market capitalization and investor demands for increased size

and scale with lower leverage.  Accordingly, the Debtors' board directed the Debtors' management to intensify its efforts to find a strategic transaction partner and reduce HighPoint's capital expenditures.

40.     In late 2019, the Debtors sought to take proactive steps to optimize their balance sheet and capital needs, including potential strategic actions regarding strategic alternatives, assets dispositions, consolidation and acquisition opportunities, and possible equitization of the Notes. In the normal course of business, the Debtor maintains dialog with all of its stakeholders with its Investor Relations outreach.   However, in November 2019, the Debtors' board directed management to initiate discussions with HighPoint's largest Noteholder, Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts ("Franklin").  In December 2019, the Debtors' board held a special meeting with the Debtors' management and J.P. Morgan to discuss strategic alternatives and consolidation opportunities.  The Debtors' board considered that a standalone restructuring would generate less value given the lack of investor interest in small and mid-cap oil and gas exploration companies.  In the same meeting, the Debtors' management reported on the meeting with Franklin, noting that Franklin did not favor a standalone restructuring involving a significant equitization of the Notes because the resulting equity stake would have limited liquidity, and given the lack of investor interest in small and mid-cap oil and gas exploration companies.  During the months of May and June, 2020, members of the Debtors' management continued to have high-level discussions with Franklin about the state of the industry and the Debtors' financial condition.

41.     In June 2020, the Debtors received a proposal from a potential strategic partner regarding a potential business combination transaction predicated on, among other things, equitization of the Notes.  Another independent exploration and production company operating in Colorado requested HighPoint's participation in a strategic combination through its pending

Chapter 11 proceeding.  On July 2, 2020, a special committee of the board was formed to discuss and consider the status of potential strategic transactions and alternatives.

42.     Beginning in July 2020, HighPoint, with the assistance of its advisors, commenced an initial outreach to thirteen (13) potential counterparties, including BCEI, regarding a potential strategic transaction.   Throughout July and August 2020, HighPoint provided additional information, including data room access and management presentations, and executed NDAs with eleven (11) parties (including BCEI).   HighPoint received five (5) preliminary indications of interest regarding potential strategic transactions,[4] including from BCEI.  HighPoint engaged in multiple rounds of bidding with three (3) parties (including BCEI).   In parallel, HighPoint's management and its advisors continued to engage with Franklin, and Akin Gump, acting as legal counsel for Franklin, to explore a potential transaction and potential equitization of the Notes in connection with a business combination.

43.     On October 2, 2020, BCEI conveyed a revised proposal to HighPoint.  BCEI is a Denver-based independent oil and natural gas company engaged in the acquisition, exploration, development, and production of onshore oil and associated liquids-rich natural gas in the United State.  Under BCEI's revised proposal, which was made expressly on the understanding that it had not yet been approved by BCEI's board, HighPoint's stakeholders would hold, at closing, approximately 32 percent of the total BCEI Common Stock, and BCEI stockholders would hold the remaining 68 percent.  In addition, BCEI would issue up to $100 million in newly issued senior unsecured notes to HighPoint's Noteholders, with the $100 million amount decreasing to the extent that HighPoint's Noteholders did not participate in the equitization process.   The Debtors understand that, on October 8, 2020, the BCEI board approved this revised proposal and authorized

---

[4]     In addition, HighPoint received three (3) indications of interest regarding potential financing transactions.

BCEI's senior management to proceed with negotiating definitive agreements consistent with that proposal.

44.     On November 9, 2020, after extensive negotiations around the terms of the Merger Agreement, the TSA, the Stockholder Support Agreement and the Plan, the Merger Agreement, the TSA, and the Stockholder Support Agreement were executed by the applicable parties thereto. These negotiations resulted in HighPoint entering into the TSA with holders of approximately 85 percent of the Notes Claims, and an equity holder holding approximately 46.5 percent of Existing HPR Interests.

**E.      High Threshold to Effect the Merger and Restructuring Transactions Out-of-Court.**

45.     On December 17, 2020, BCEI filed with the SEC two registration statements, including a joint proxy statement/prospectus with HighPoint relating to the Merger and a prospectus relating to the Exchange Offer (the "Registration Statements").  On February 9, 2021, the SEC completed its review and the Registration Statements became effective.  Thereafter, on February 10, 2021, the Debtors solicited votes from Holders of Existing HPR Interests to approve the Merger and BCEI solicited participation from Holders of Notes Claims in the Exchange Offer on an out-of-court basis.  Concurrently and in accordance with sections 1125 and 1126 of the Bankruptcy Code, the Debtors solicited votes from Holders of Notes Claims and Holders of Existing HPR Interests on the Plan.  Because requisite Holders of Notes Claims did not tender their Notes in the Exchange Offer, the Debtors were not able to consummate the Merger and restructuring transactions outside of bankruptcy.  Because other conditions to filing these Chapter 11 cases as set forth in the Merger Agreement and the TSA were satisfied, the Debtors seek to effect the Merger and the Restructuring Transactions through the Plan in these chapter 11 cases.

F.    **Plan, Transaction Support Agreement, and Merger Agreement.**

46.    With the TSA and Merger Agreement in hand, HighPoint completed solicitation of the prepackaged Plan prior to the Petition Date. The restructuring transactions contemplated by the Plan, the Merger Agreement, and the TSA include:

- *Cancellation of Notes Claims and Existing HPR Interests in Exchange for BCEI Common Stock.*  Holders of Allowed Notes Claims and Existing HPR Interests will receive their Pro Rata share of 9,804,435 shares of BCEI Common Stock, in accordance with and subject to dilution as permitted by the terms set forth in the Merger Agreement and the Plan.  Based on the number of shares of BCEI Common Stock outstanding as of November 9, 2020, Holders of Allowed Notes Claims will receive approximately 30.4 percent of BCEI Common Stock in the aggregate, Holders of Allowed Existing HPR Interests will receive approximately 1.6 percent of BCEI Common Stock in the aggregate, and existing stockholders of BCEI would own approximately 68 percent of BCEI Common Stock;

- *New Take Back Notes*.  In addition to BCEI Common Stock, Holders of Allowed Notes Claims will receive their Pro Rata share of $100 million in aggregate principal amount of the New Take Back Notes;

- *Exit RBL Facility.*   The capital structure of BCEI following the consummation of the transactions contemplated by the Plan will include a senior secured credit facility with aggregate available commitments (drawn and undrawn, collectively) of not less than $250 million in principal amount.  Allowed RBL Claims are Unimpaired under the Plan; and

- *Operational Claims Unimpaired*.  Outstanding and undisputed claims are unimpaired under the Plan.

47.    The TSA requires that the Debtors proceed in accordance with the TSA milestones, including securing confirmation of the Plan within 45 days after the Petition Date, and the occurrence of the Effective Date within 60 days after the Petition Date.

48.    Preserving value for the benefit of the Debtors' estates depends, in large part, on the Debtors proceeding swiftly to confirmation of the Plan and emergence from chapter 11.  For example, certain employee transition matters will be optimized if the Debtors are able to consummate the Merger and the Plan by April 2, 2021.  The Debtors will likewise save on incremental professional fees and other administrative costs associated with administering Chapter

11 cases if they are able to emerge swiftly. Accordingly, as described in the Scheduling Motion (as defined below), HighPoint requests that the Court schedule the hearing to approve the adequacy of the Disclosure Statement and confirm the Plan on March 18, 2021, or as soon thereafter as the Court is available.  HighPoint believes the proposed confirmation schedule is appropriate in light of the unique circumstances of these chapter 11 cases, where nearly all funded debt holders have already agreed to support the Plan, the allowed claims of all other creditors will ride through the bankruptcy unimpaired, and significant public disclosures of the terms of the restructuring and related transaction were made in advance of the Petition Date.  In light of the incredible consensus forged to date, it would be detrimental for all parties in interest if any delays prevented HighPoint from expeditiously consummating the Merger and the restructuring transaction contemplated by the Plan, the Merger Agreement and the TSA.

## IV.    First Day Motions.

49.    Contemporaneously herewith, HighPoint filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize HighPoint's business operations, facilitate the efficient administration of these chapter 11 cases, and ensure a swift and smooth consummation of the Merger and the restructuring transactions, including:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Scheduling A Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, (III) Directing That A Meeting of Creditors Not Be Convened, (IV) Waiving the Requirement of Filing Statements of Financial Affairs*

*and Schedules of Assets and Liabilities, and (V) Granting Related Relief* (the "Scheduling Motion");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Specified Lienholder and Other Trade Claims, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes, Fees, and Penalties and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Mineral Payments, (B) Working Interest Disbursements, and (C) Joint Interest Billings and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Shares, and (II) Granting Related Relief;*

- *Debtors' Application for Appointment of Epiq Corporate Restructuring, LLC, as Claims and Noticing Agent;*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of the 30 Largest Unsecured Creditors, and (II) Authorizing the Debtors to Redact Certain Personal Identification Information;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase and Finance Insurance Policies, and (C) Continue and Renew Their Surety Bond Program and (II) Granting Related Relief; and*

- *Debtors' Motionn for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Adequate Assurance Requests, and (IV) Granting Related Relief.*

50.     I have reviewed and am familiar with the content and substance of each of the First Day Motions, and have consulted with advisors regarding each of the First Day Motions to ensure I understand each and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

51.    I believe that the relief requested in the First Day Motions is necessary, in the best interests of HighPoint's estates, its creditors, and all other parties in interest, and will allow HighPoint to operate with minimal disruption and maximum value preservation during the pendency of these chapter 11 cases.  If the Court does not grant the relief requested by the Debtors in the First Day Motions, I believe HighPoint, its businesses, and its estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  March 14, 2021

*By: William M. Crawford*
Name: William M. Crawford
Title: Chief Financial Officer
HighPoint Resources Corporation