## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHPOINT RESOURCES CORP., *et al.*,[1] | ) | Case No. 21-10565 (CSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF AN ORDER APPROVING THE DEBTORS'
## DISCLOSURE STATEMENT FOR, AND CONFIRMING, THE DEBTORS' FIRST
## AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

- and -

Morton R. Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-3007
Facsimile:      (215) 568-6603

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  March 14, 2021

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HighPoint Resources Corporation (0361); HighPoint Operating Corporation (0545); and Fifth Pocket Production, LLC (8360).  The location of the Debtors' principal place of business is 555 17th Street, Suite 3700 Denver, Colorado 80202.

# TABLE OF CONTENTS

**Page(s)**

RELIEF REQUESTED..............................................................................................................1

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...................................................................................................................3

I.      The Restructuring Transactions. ................................................................................3

II.     The Solicitation Process and Voting Results. ..........................................................6

ARGUMENT ......................................................................................................................11

I.      Approval of the Disclosure Statement Is Warranted. ...........................................11

      A.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy
        Code. ..........................................................................................................11

            1.      The SEC's Review of the Registration Statements Demonstrates
                that the Debtors Complied with Applicable Nonbankruptcy Law............12

            2.      The Disclosure Statement Contains Adequate Information......................13

II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and
        Should Be Confirmed. ................................................................................16

      A.      The Plan Complies with the Applicable Provisions of the Bankruptcy
        Code (§ 1129(a)(1)). ..........................................................................16

            1.      The Plan Satisfies the Classification Requirements of Section 1122
                of the Bankruptcy Code. ..........................................................16

            2.      The Plan Satisfies the Mandatory Plan Requirements of
                Section 1123(a) of the Bankruptcy Code..................................................19

                  a.      Designation of Classes of Claims and Equity Interests and
                        Specification of Unimpaired Classes (§ 1123(a)(1)–(2))...............19

                  b.      Treatment of Impaired Classes (§ 1123(a)(3))..............................19

                  c.      Equal Treatment within Classes (§ 1123(a)(4))............................19

                  d.      Means for Implementation (§ 1123(a)(5)). ...................................20

**Page(s)**

   e. Issuance of Non-Voting Securities (§ 1123(a)(6))........................21

   f. Directors and Officers (§ 1123(a)(7)). ...........................................22

  3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code...................................................23

   a. Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code. .............................................................23

   b. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code. .........................24

  4. The Plan Complies with Section 1123(d) of the Bankruptcy Code...........34

B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))........................................................................34

  1. The Debtors Complied with Section 1125 of the Bankruptcy Code. ........35

  2. The Debtors Complied with Section 1126 of the Bankruptcy Code. ........35

C. The Plan Is Proposed in Good Faith (§ 1129(a)(3)). ................................................36

D. The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). .....................................37

E. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ......................................................................38

F. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6))...............................................................................................................40

G. The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7))...............................................................................................................40

H. The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ..........................................................41

I. The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9))...............................................................................................................42

J. At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10))............................................................................................................43

K. The Plan Is Feasible (§ 1129(a)(11)). .....................................................................43

L. All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...........................46

Page(s)

M.   All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ..............46

N.   Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. .................47

O.   The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of
     the Bankruptcy Code...........................................................................................47

     1.   The Plan Does Not Unfairly Discriminate with Respect to the
          Impaired Classes that Have Not Voted to Accept the Plan
          (§ 1129(b)(1))............................................................................................48

     2.   The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))................................49

P.   The Plan Complies with the Other Provisions of Section 1129 of the
     Bankruptcy Code (§ 1129(c)–(e))..........................................................................50

Q.   Good Cause Exists to Waive the Stay of the Confirmation Order. ......................51

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*,
   701 F.2d 1071 (2d Cir. 1983) ................................................................................37

*Bank of Am. Nat. Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ............................................................................................48

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
   764 F.2d 406 (5th Cir. 1985) ..............................................................................36

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
   860 F.2d 94 (3d Cir. 1988) ..................................................................................13

*Cosocff v. Rodman (In re W.T. Grant Co.)*,
   699 F.2d 599 (2d Cir. 1983) ................................................................................24

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) ..............................................................................36

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
   81 B.R. 274 (D. Del. 1988) .................................................................................13

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
   10 F.3d 944 (2d Cir. 1993) ..................................................................................17

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995) .................................................................48

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) .............................................................17

*In re Abbotts Dairies of Pa., Inc.*,
   788 F.2d 143 (3d Cir. 1986) ................................................................................36

*In re Adelphia Commc'ns. Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................40

*In re Aleris Int'l, Inc.*,
   No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) .............44

*In re Ambanc La Mesa L.P.*,
   115 F.3d 650 (9th Cir. 1997) ..............................................................................47

*In re Anna Holdings, Inc.*,
No. 19-12551 (CSS) (Bankr. D. Del. Dec. 17, 2019) ............................................53

*In re Apex Oil Co.*,
118 B.R. 683 (Bankr. E.D. Mo. 1990) ....................................................................39

*In re Armstrong World Indus.*,
348 B.R. 111 (Bankr. D. Del. 2006) ......................................................................48

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (Bankr. D. Del. 2006) ......................................................................16

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................48

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ..................................................................39

*In re Blackhawk Mining, LLC*,
No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) ............................................53

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ............................51

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ..............44

*In re Century Glove, Inc.*,
Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993) ..................36, 40

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) ....................................................................37

*In re Clover Techs. Grp. LLC*,
No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020) (same) ...............................53

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ................................................................24, 48

*In re Dex One Corp.*,
No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) .........................................12, 52

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............................................................17, 38

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992) ...................................................................................33

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005)........................................................................................33

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ..............................................................................24

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ................................................................................25

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ................................................................................44

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ......................................................................48

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988) ..........................................................................37

*In re Gatehouse Media, Inc.*,
No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) .................................................52

*In re Geokinetics Inc.*,
No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ..................................................52

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009)....................51

*In re GSE Envtl., Inc.*,
No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) .................................................52

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007).........................................................................17

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ............................................................................28

*In re ION Media Networks, Inc.*,
No. 09-13125 (JMP) (Bankr. S.D.N.Y. Nov. 24, 2009) ..............................................50

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)........................................................................................17

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...........................................................................48

*In re Lapworth*,
No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)...................34

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ......................................................................40

*In re Lernout & Hauspie Speech Prods., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003) ......................................................................48

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (D.N.J. 2005) ...........................................................................14, 37

*In re Longview Power, LLC*,
No. 20-10951 (BLS) (Bankr. D. Del. May. 22, 2020) ............................................53

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994) ...................................................................25

*In re Metrocraft Publ'g. Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ......................................................................15

*In re Neff*,
60 B.R. 448 (Bankr. N.D. Tex. 1985) *aff'd,* 785 F.2d 1033 (5th Cir. 1986) ..........40

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ......................................................................36

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ......................................................................16

*In re PC Liquidation Corp.*,
383 B.R. 856 (E.D.N.Y. 2008) .............................................................................14

*In re PES Holdings, LLC*,
No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) .................................................28

*In re Phx. Petrol. Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ....................................................................14

*In re Physiotherapy Holdings, Inc.*,
No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ...............................................52

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ..........16, 31

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ....................................................................44

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)........................................................................31, 33, 36

*In re River Vill. Assocs.*,
    181 B.R. 795 (E.D. Pa. 1995) .......................................................14

*In re Rusty Jones, Inc.*,
    110 B.R. 362 (Bankr. N.D. Ill. 1990) ..........................................38

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ............................................16

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988).........................................15

*In re Sea Garden Motel & Apartments*,
    195 B.R. 294 (D. N.J. 1996) ........................................................44

*In re Sherwood Square Assoc.*,
    107 B.R. 872 (Bankr. D. Md. 1989) ............................................39

*In re Source Home Entm't, LLC*,
    No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015)....................52

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ....................... 24, 25, 28, 31

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ...........................................39

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ..............................................16

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)...........................................38

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011),
    *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).....................44

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) .........................................15

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ....................44

*In re Verso Corp.*,
    No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) .............................32

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)..................................................36, 44

**Page(s)**

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ..................................................24

*In re Wiersma*,
227 F. App'x 603 (9th Cir. 2007) ....................................................16

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) ..................................................24

*In re Worldcom, Inc.*,
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ........34

*In re Z Gallerie, LLC*,
Case No. 19-10488 (LSS) (Bankr. D. Del. June 20, 2019).....................53

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ...........................................12, 25, 28

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)...........................................................17, 47

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988)...........................................................44

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003)............................................................13

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984).......................................................................37

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988)...........................................................13

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
844 F.2d 1142 (5th Cir. 1988) ........................................................14

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976).......................................................................13

**Statutes**

11 U.S.C. § 101(51D)(B)..................................................................51

11 U.S.C. §§ 101–1532......................................................................1

11 U.S.C. § 328(a) ..........................................................................38

11 U.S.C. § 330(a)(1)(A) ..................................................................38

**Page(s)**

11 U.S.C. § 1102 ................................................................................................................3

11 U.S.C. § 1107(a) ...........................................................................................................3

11 U.S.C. § 1108 ................................................................................................................3

11 U.S.C. § 1122 ......................................................................................................... *passim*

11 U.S.C. § 1122(a) ..........................................................................................................16

11 U.S.C. § 1123 ..............................................................................................................16

11 U.S.C. § 1123(a) ..........................................................................................................19

11 U.S.C. § 1123(a)(1)–(2) ..............................................................................................19

11 U.S.C. § 1123(a)(3) ......................................................................................................19

11 U.S.C. § 1123(a)(4) ......................................................................................................19

11 U.S.C. § 1123(a)(5) ................................................................................................20, 21

11 U.S.C. § 1123(a)(6) ......................................................................................................21

11 U.S.C. § 1123(a)(7) ......................................................................................................22

11 U.S.C. § 1123(b) ..........................................................................................................21

11 U.S.C. § 1123(b)(1)–(3) ..............................................................................................23

11 U.S.C. § 1123(b)(3)(A) ................................................................................................24

11 U.S.C. § 1123(d) ..........................................................................................................34

11 U.S.C. § 1125 ......................................................................................................... *passim*

11 U.S.C. § 1125(a) ....................................................................................................11, 15

11 U.S.C. § 1125(a)(1) ......................................................................................................13

11 U.S.C. § 1125(g) ....................................................................................................11, 13

11 U.S.C. § 1126 ......................................................................................................... *passim*

11 U.S.C. § 1126(a) ..........................................................................................................35

11 U.S.C. § 1126(b) ..........................................................................................................11

11 U.S.C. § 1126(b)(1) ......................................................................................................12

**Page(s)**

11 U.S.C. § 1126(b)(2) ..................................................................................................14

11 U.S.C. § 1126(c) ......................................................................................................36

11 U.S.C. § 1126(f) ...................................................................................................7, 35

11 U.S.C. § 1126(g) ...................................................................................................8, 35

11 U.S.C. § 1129 ..................................................................................................... *passim*

11 U.S.C. § 1129(a)(1) ..................................................................................................16

11 U.S.C. § 1129(a)(2) .................................................................................31, 34, 36

11 U.S.C. § 1129(a)(3) .................................................................................31, 38, 39

11 U.S.C. § 1129(a)(4) ..................................................................................................37

11 U.S.C. § 1129(a)(5) ..................................................................................................38

11 U.S.C. § 1129(a)(5)(A)(i) .........................................................................................38

11 U.S.C. § 1129(a)(5)(A)(ii) ........................................................................................39

11 U.S.C. § 1129(a)(5)(B) .............................................................................................39

11 U.S.C. § 1129(a)(6) ..................................................................................................39

11 U.S.C. § 1129(a)(7) ..................................................................................................40

11 U.S.C. § 1129(a)(8) .................................................................................41, 43, 47

11 U.S.C. § 1129(a)(9) ..................................................................................................42

11 U.S.C. § 1129(a)(9)(A) .............................................................................................42

11 U.S.C. § 1129(a)(9)(B) .............................................................................................42

11 U.S.C. § 1129(a)(9)(C) .............................................................................................42

11 U.S.C. § 1129(a)(10) ............................................................................................41, 43

11 U.S.C. § 1129(a)(11) ..................................................................................................43

11 U.S.C. § 1129(a)(12) ..................................................................................................46

11 U.S.C. § 1129(a)(13) ..................................................................................................46

11 U.S.C. § 1129(a)(14) ..................................................................................................47

**Page(s)**

11 U.S.C. § 1129(a)(15) ...................................................................................................47

11 U.S.C. § 1129(a)(16) ...................................................................................................47

11 U.S.C. § 1129(b)(1) ................................................................................................47,48

11 U.S.C. § 1129(b)(2)(B)(ii) ..........................................................................................49

11 U.S.C. § 1129(c) ..........................................................................................................50

11 U.S.C. § 1129(d) ..........................................................................................................50

11 U.S.C. § 1129(e) ..........................................................................................................51

11 U.S.C. § 3017(d) ..........................................................................................................11

11 U.S.C. § 3017(e) ..........................................................................................................11

11 U.S.C. § 3018(b) ..........................................................................................................11

11 U.S.C. § 3018(c) ..........................................................................................................11

11 U.S.C. § 3020(e) ..........................................................................................................52

11 U.S.C. § 6004 ...............................................................................................................52

11 U.S.C. § 6006 ...............................................................................................................52

15 U.S.C. § 77a .................................................................................................................12

15 U.S.C. § 77g .................................................................................................................12

**Other Authorities**

17 C.F.R. § 240.14a ..........................................................................................................12

7 *Collier on Bankruptcy* ¶ 1126.03[1] (16th ed.) ..........................................................12

7 *Collier on Bankruptcy* ¶ 1129.02[5][b] (16th ed.) ......................................................39

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 .......................................16

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787 ...........................................16

## RELIEF REQUESTED

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of approval of their *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and confirmation of the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3] (as modified, amended, or supplemented from time to time, the "Plan"), pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). In support of the Plan, the Debtors have filed the declarations of Stephen Spitzer, Managing Director of AlixPartners, the Debtors' financial advisors (the "Spitzer Declaration"), and Jeffrey Knupp, Managing Director at Tudor Pickering Holt & Co Advisors LP and its affiliates, including Perella Weinberg Partners (collectively, "TPH-PWP"), the Debtors' investment banker (the "Knupp Declaration"), filed contemporaneously herewith, and the *Declaration of Jane Sullivan of Epiq Corporate Restructuring LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Report"). In support of confirmation of the Plan and approval of the Disclosure Statement, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT

1.      The Plan and the Merger Agreement are the product of extensive negotiations with the Debtors' existing stakeholders, including their senior noteholders, equity holders, secured lenders, and various strategic partners, including their merger counterparty, BCEI. These negotiations occurred almost entirely out-of-court and resulted in entry into the Merger Agreement, the Transaction Support Agreement (the "TSA"), and the Stockholder Support

Agreement.  Holders of approximately 86% of the Notes Claims, together with holders of approximately 46.5% of the Existing HPR Interests, are party to the TSA.  The Plan provides a clear roadmap for the Reorganized Debtors to swiftly and efficiently emerge from bankruptcy and consummate the Merger and the Restructuring Transactions, with greater flexibility and freedom to better operate in a new and very different post-COVID-19 landscape.

2.      Ninety-nine percent of Claims or Interests that cast votes on the Plan voted to accept the Plan (each, a "Voting Class" and collectively, the "Voting Classes").[2]  Pursuant to the TSA and the Merger Agreement, the Debtors solicited votes on the prepackaged Plan in advance of the Petition Date.  The Restructuring Transactions embodied in the Plan, the Merger Agreement and the TSA, equitize more than $625 million of the Debtors' funded debt, and position the Reorganized Debtors for long-term success for the benefit of all their stakeholders.  After giving effect to the Merger and such Restructuring Transactions, Holders of Allowed Notes Claims will own approximately 30.4 percent in the aggregate, and Holders of Allowed Existing HPR Interests will own approximately 1.6 percent in the aggregate, of BCEI[3] on a fully-diluted basis, in each case based on the number of shares of BCEI Common Stock outstanding as of November 9, 2020.  Holders of Allowed Notes Claims will also receive their Pro Rata share of $100 million of New Take Back Notes.  All other creditors—including General Unsecured Creditors—are Unimpaired under the Plan.

3.      The Plan represents the culmination of significant efforts by multiple parties in interest to reach a fair and equitable resolution of various complex business and legal issues.  These

---

[2]   Voting Classes representing approximately 99 percent by amounts of Notes Claims and 99 percent by amount of Existing HPR Interests who submitted ballots.   Voting Report.

[3]   Capitalized terms used but not otherwise defined in this memorandum have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Bankruptcy Code, as applicable.

efforts have resulted in a Plan that provides significant value for the Debtors' stakeholders and a vehicle for the Debtors' successful consummation of the Merger and deleveraging transactions contemplated in connection therewith. Unsurprisingly, given the overwhelming support of the Plan and the payment of general unsecured creditors in full, the Debtors have received no objections to approval of the Disclosure Statement or confirmation of the Plan. Contemporaneously herewith, the Debtors have filed a proposed confirmation order (the "Proposed Confirmation Order") and documentation in support of confirmation of the Plan.

4.      As discussed in detail below, the Plan satisfies each of the Bankruptcy Code's confirmation requirements. For these and other reasons set forth more fully in this Memorandum, and based on the evidence to be presented at the hearing to consider approval of the Disclosure Statement and Confirmation of the Plan (the "Confirmation Hearing"), the Court should approve the Disclosure Statement and enter the Proposed Confirmation Order.

## BACKGROUND[4]

### I.      The Restructuring Transactions.

5.      Headquartered in Denver, Colorado, the Debtors are an oil and gas company engaged in the exploration, development and production of oil, natural gas, and natural gas liquids ("NGLs"). The Debtors' primary production and development activities are located in the Denver-Julesburg ("DJ") Basin in Colorado's eastern plains. As of December 31, 2020, the Debtors held (i) interests in approximately 566 gross wells, a substantial majority of which are Debtor-operated,

---

[4]    A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of William M. Crawford, Chief Financial Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 6] (the "First Day Declaration"). Concurrently with the filing of this Memorandum, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No committees have been appointed or designated pursuant to section 1102 of the Bankruptcy Code.

(ii) approximately 131,683 net acres of developed and undeveloped leasehold, and (iii) estimated proved developed reserves of approximately 51 million barrels of oil equivalent, in the aggregate, of oil, natural gas and natural gas liquids based on Securities and Exchange Commission parameters.

6.     The Debtors, like many of their industry peers, experienced significant challenges over the past several years due to sustained downturns and volatility in commodities markets.  In March 2020, such challenges were exacerbated by an unprecedented drop in global energy prices and market uncertainty due to the combined effects of the COVID-19 pandemic and tensions between OPEC and Russia.

7.     The extreme and sudden downturn in March 2020 fundamentally changed the economic landscape in which the Debtors operate and prompted them to explore strategic alternatives, including a value-maximizing restructuring transaction or other potential strategic transaction, to address their capital structure, maturity profile and liquidity needs.  Specifically, the Debtors' capital structure consists of approximately $765 million in total principal amount of indebtedness outstanding as of September 30, 2020, including approximately $140 million in aggregate principal amount outstanding under the RBL Facility; $350 million in aggregate principal amount outstanding under the 7% Notes; and $275 million in aggregate principal amount outstanding under the 8.75% Notes.

8.     As a result, in mid-April 2020, the Debtors engaged financial and legal advisors to explore a range of strategic alternatives to enhance the Debtors' liquidity, evaluate merger and acquisition opportunities, and address their capital structure and maturity profile.  During the second and third quarters of 2020, the Debtors undertook an extensive marketing and negotiation process, as further described herein, with their existing stakeholders and other strategic partners in

respect of a potential transaction.  On November 9, 2020, those efforts ultimately culminated with entry into the Merger Agreement, the TSA, and the Stockholder Support Agreement.

9.       The Plan implements the comprehensive restructuring and certain recapitalization transactions, whereby, among other things, Boron Merger Sub Inc. ("Merger Sub"), a wholly owned affiliate of Bonanza Creek Energy, Inc. ("BCEI"), will merge with and into HighPoint Resources Corporation as contemplated under that certain Agreement and Plan of Merger, dated as of November 9, 2020 (such transaction, the "Merger", and such agreement, the "Merger Agreement"), and certain restructuring transactions contemplated under the Merger Agreement and the TSA.  The Plan includes the following key features:

- *Cancellation of Notes Claims and Existing HPR Interests in Exchange for BCEI Common Stock.*  Holders of Allowed Notes Claims and Existing HPR Interests will receive their Pro Rata share of 9,804,435 shares of BCEI Common Stock, in accordance with and subject to dilution as permitted by the terms set forth in the Merger Agreement and the Plan.  Based on the number of shares of BCEI Common Stock outstanding as of November 9, 2020, Holders of Allowed Notes Claims will receive approximately 30.4 percent of BCEI Common Stock in the aggregate, Holders of Allowed Existing HPR Interests will receive approximately 1.6 percent of BCEI Common Stock in the aggregate, and existing stockholders of BCEI would own approximately 68 percent of BCEI Common Stock.

- *New Take Back Notes*.  In addition to BCEI Common Stock, Holders of Allowed Notes Claims will receive their Pro Rata share of $100 million in aggregate principal amount of the New Take Back Notes.

- *Exit RBL Facility.*  The capital structure of BCEI following the consummation of the transactions contemplated by the Plan shall include a senior secured credit facility with aggregate available commitments (drawn and undrawn, collectively) of not less than $250 million in principal amount (the "Exit RBL Facility").  Allowed RBL Claims are Unimpaired under the Plan.

- *Operational Claims Unimpaired*.  Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed General Unsecured Claims are Unimpaired under the Plan.

**II.     The Solicitation Process and Voting Results.**

10.     The Debtors focused significant efforts on carefully tailoring their notice and due process procedures in these Chapter 11 Cases.   On February 10, 2021, 32 days prior to commencing these Chapter 11 Cases, and as more fully described in the Scheduling Motion,[5] the Debtors caused their noticing and balloting agent, Epiq Corporate Restructuring LLC ("Epiq"), to distribute solicitation packages (the "Solicitation Packages") containing the Disclosure Statement, the Plan, and the appropriate ballots for voting on the Plan (the "Ballots")[6] to the Voting Classes holding the relevant Claims and Interests as of February 1, 2021 (the "Voting Record Date") in accordance with sections 1125 and 1126 of the Bankruptcy Code.  Epiq transmitted the Solicitation Packages to the Voting Classes via email service and hard copy mailing.

11.     The Voting Classes to whom the Solicitation Packages were transmitted were directed in the Disclosure Statement and Ballots to follow the instructions contained in the Ballots (and described in the Disclosure Statement) to complete and submit their respective Ballots to cast a vote to accept or reject the Plan.  Each Voting Party was informed in the Disclosure Statement and ballot that such holder needed to submit its ballot such that it was actually received by Epiq by the Voting Deadline to be counted.

12.     To ensure that the due process rights of parties-in-interest were protected, on February 10, 2021, the Debtors mailed, or caused to be delivered, to all known parties in interest (including all parties listed on the creditor matrix and all securities holders of record as of the

---

[5]     *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures and Dates, Deadlines, and Notices related thereto (III) Directing that a Meeting of Creditors Not be Convened, (IV) Waiving the Requirements of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities, and (V) Granting Related Relief* filed contemporaneously herewith (the "Scheduling Motion").

[6]     The form of Ballots used in solicitation is included in Exhibits 5, 6, 7, 8, and 9 attached to the Scheduling Motion.

Voting Record Date), which total no less than approximately 5,000 parties, notice that informed recipients of (a) the Debtors' intention to commence these Chapter 11 Cases on or around March 16, 2021, (b) the Debtors' intention to request that the Court schedule the Confirmation Hearing on or as soon as reasonably practicable after the Petition Date, (c) the key terms of the Plan, including classification and treatment of Claims and Interests, (d) key dates and information regarding approval of the Disclosure Statement and confirmation of the Plan and the Plan Objection Deadline, (e) the multiple methods by which parties may access copies of the Plan, Disclosure Statement, and TSA, (f) the full text of the release, exculpation, and injunction provisions set forth in the Plan, (g) the applicable deadlines with respect to objections to the Plan or Disclosure Statement and (h) the applicable deadlines with respect to cure of defaults for assumed Executory Contracts and Unexpired Leases (the "Combined Notice").[7] The Combined Notice also informed parties in interest how they could opt out of the Third-Party Release contained in the Plan by either checking the appropriate box on their Ballot in advance of the Voting Deadline or by sending an email to Epiq with a message indicating that such party in interest does not consent to the Third-Party Release and would like to opt out of the Third-Party Release in advance of the Voting Deadline, as applicable.  The Debtors further caused the Combined Notice to be published in *The New York Times* and *The Denver Post* on February 16, 2021.[8]

13.    Holders of Claims and Interests received the Combined Notice but were not provided a Solicitation Package if such Holders are either (a) Unimpaired under and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code or (b) Impaired, entitled

---

[7]    A copy of the Combined Notice is attached as Exhibit 1 to the Scheduling Motion.

[8]    Contemporaneously herewith, the Debtors filed proofs of publication of the Combined Notice.

to receive no distribution on account of such Claims or Interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

14.    As noted above, the Debtors provided prepetition notice of the Plan, Disclosure Statement, and Combined Notice to various stakeholders and parties in interest and shared working drafts of all materials with the TSA and Merger Agreement parties to incorporate their feedback. Here, the Debtors have gone further by posting various key documents, including the Plan, the Disclosure Statement, the Combined Notice, the Plan Supplement, and the proposed first-day motions, on the public restructuring website maintained by Epiq (which was launched on February 10, 2021). The Debtors also directed Epiq to serve parties with notice of such documents as they were posted to the Epiq sites. Specifically, the Debtors, through their advisors, provided the following notice.

- On November 9, 2020, the Debtors announced the Restructuring Transactions and publicly disclosed a substantially final version of the Plan via Form 8-K.

- On December 17, 2020, the Debtors publicly disclosed substantially final versions of the Solicitation Packages as part of filing initial versions of the Registration Statements with the Securities and Exchange Commission.

- From December 17, 2020, until February 9, 2021, the Securities and Exchange Commission reviewed and commented on the Registration Statements, inclusive of the Solicitation Packages.

- On February 5, 2021, the Debtors filed final versions of the Registration Statements, inclusive of the Solicitation Packages, with the Securities and Exchange Commission.

- On February 9, 2021, the Securities and Exchange Commission declared the Registration Statements, inclusive of the Solicitation Packages, effective.

- On February 10, 2021, the Debtors launched solicitation of the Plan and mailed, or caused to be mailed, the Solicitation Packages to all Voting Classes.

- On February 10, 2021, the Debtors posted the Combined Notice, Plan, and Disclosure Statement to Epiq's public website.

- On February 10, 2021, the Debtors served the Combined Notice to parties in interest.

- On February 16, 2021, the Combined Hearing Notice (modified for publication) was published in the *The New York Times* and *The Denver Post*.

- On March 2, 2021, the Debtors posted the proposed forms of all first-day pleadings to the case website and served notice of proposed forms of all first-day pleadings on all parties in interest.

- On March 4, 2021, the Debtors posted the Plan Supplement to the public case website and served notice of the Plan Supplement on all parties in interest.

- On March 14, 2021, the Debtors filed the proposed forms of all confirmation materials, including this Memorandum and the declarations in support of confirmation of the Plan and approval of the Disclosure Statement.

15.    The Debtors also maintained constant contact with their key constituents and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") to resolve possible objections to the Plan and any "first day" relief.  For example, prior to the February 10, 2021, solicitation launch, counsel for the Debtors reached out to the U.S. Trustee to notify them about the bankruptcy process and describe the Plan and contemplated notice procedures to be employed in connection therewith.  On February 19, 2021, the Debtors delivered the Plan, Disclosure Statement, first-day pleadings and confirmation materials to the U.S. Trustee.  On February 25, 2021, the Debtors federal express overnight delivered the first-day pleadings and solicitation materials at the U.S. Trustee's request.  On March 5, 2021, the Debtors delivered the Plan Supplement and related materials to the U.S. Trustee.  From February 19, 2021, to March 12, 2021, the Debtors attempted to engage with the U.S. Trustee, on multiple occasions, regarding the Plan, the Disclosure Statement, the solicitation process, and any "first day" relief.  Finally, the Debtors' advisors responded to inbound requests for information from parties in interest, including general unsecured creditors, regarding the Plan and the treatment of Claims and Interests thereunder.

16.    The Debtors completed their solicitation on March 11, 2021 (the "Voting Deadline"), 3 days prior to the Petition Date.  The Debtors completed their final tabulation of the Ballots on March 12, 2021, following a complete review and audit of all Ballots received.[9] As more fully set forth in the Voting Report (defined below), Holders of 99 percent by amount of voting Notes Claims and 99 percent by amount of voting Existing HPR Interests voted to accept the Plan, exceeding what is required for each class to constitute an accepting class for purposes of plan approval under the Bankruptcy Code.[10]

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | NUMBER | AMOUNT | NUMBER | AMOUNT |
| **Class 4 Notes Claims** | 105 **90.52%** | $529,250,000 **99.38%** | 11 **9.4%** | $3,278,000 **0.62%** |
| **Class 8 Existing HPR Interests** | | 2,314,636.11 **99.17%** | | 19,358 **0.83%** |

17.    The Debtors and their advisors have employed a fully fair and transparent process. The Debtors submit that there are significant factors that support the Debtors' request to confirm the Plan on the first day hearing in these Chapter 11 Cases, including that the Debtors have provided 29 days' notice of the Plan to all known parties in interest (a total of approximately 5,000 parties) and that Impaired Classes entitled to vote has voted in favor of the Plan.  The near unanimous support of the Plan by each of the Voting Classes represents a mandate for the Debtors to proceed with the restructuring on the timeline warranted by the facts of these Chapter 11 Cases.

---

[9]    For additional discussion about, and certification of, the solicitation and vote tabulation processes, see the Voting Report.

[10]    *See generally* Voting Report.

## ARGUMENT

18.    The first section of this Memorandum requests approval of the Disclosure Statement.  The second section contains the Debtors' "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, requests that the Court confirm the Plan.

**I.    Approval of the Disclosure Statement Is Warranted.**

**A.    The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code.**

19.    To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code, and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).

20.    Section 1125(g) of the Bankruptcy Code provides that:

> [A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.

21.    Section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

22.    Prepetition solicitations must therefore either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate

information," as applicable, under section 1125(a) of the Bankruptcy Code.  As discussed below, the Debtors satisfied sections 1125(g) and 1126(b), as applicable, of the Bankruptcy Code.

### 1. The SEC's Review of the Registration Statements Demonstrates that the Debtors Complied with Applicable Nonbankruptcy Law.

23.    In accordance with section 1126(b)(1) of the Bankruptcy Code, the Debtors' solicitation of Holders of Existing HPR Interests complied with the Securities Exchange Act of 1934, 15 U.S.C. § 77a et seq. and Reg. 14A, 17 C.F.R. § 240.14a-1 et seq. (the "1934 Act"), which is the relevant applicable nonbankruptcy law.  Additionally, because the Merger requires the registration of new securities—the newly issued BCEI Common Stock—on December 17, 2020, the BCEI filed with the SEC two registration statements, including a joint BCEI/HPR proxy statement/prospectus relating to the Merger, and  a prospectus relating to the Exchange Offer (as defined in the Merger Agreement) (the "Registration Statements").  The Registration Statements complied with the registration requirements of the Securities Act of 1933, including the significant disclosure requirements therein.[11]  On February 9, 2021, the SEC completed its review of the Registration Statements and indicated it did not have any further comments.  The SEC declared the Registration Statements effective that same day.[12]  No party in interest has objected to the Disclosure Statement on account of noncompliance with applicable nonbankruptcy law.[13]

---

[11]    15 U.S.C. §§ 77g, and related regulations.

[12]    See Dex One Corp. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (approving procedures for solicitation that complied with applicable securities law where debtors registered materials with the Securities and Exchange Commission); see also 7 Collier on Bankruptcy ¶ 1126.03[1] (16th ed. 2012) ("[I]f the debtor proposed a recapitalization plan prior to the commencement of a case and solicited the consents of its debenture holders or shareholders pursuant to a proxy statement that was filed with, and approved by, the Securities and Exchange Commission, those consents may be used after the commencement of the chapter 11 case, since the solicitation was conducted in accordance with applicable nonbankruptcy law, rules or regulations, namely the proxy rules of the Securities and Exchange Act of 1934.").

[13]    TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (internal quotations omitted).

24.    As described in detail below, the Disclosure Statement contains extensive disclosures regarding all of the facts material to voting to accept or reject the Plan. Accordingly, the Debtors respectfully submit that the Disclosure Statement satisfies the disclosure requirements of applicable nonbankruptcy law under the terms of sections 1125(g) and 1126(b)(1) of the Bankruptcy Code.

### 2.    The Disclosure Statement Contains Adequate Information.

25.    The primary purpose of a disclosure statement is to provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[14] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[15] Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[16]

---

[14]    *See, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

[15]    11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources).

[16]    *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *In re River Vill. Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (same); *In re Phx. Petrol. Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same); *see also In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes adequate information in any particular situation is determined on a case-by-case

26.     Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

a.      the events which led to the filing of a bankruptcy petition and the relationship of a debtor with the affiliates;

b.      a description of the available assets and the value of the present condition of a debtor while in chapter 11;

c.      the anticipated future of the company and the claims asserted against a debtor;

d.      the source of information stated in the disclosure statement;

e.      the estimated return to creditors under a chapter 7 liquidation;

f.      the future management of a debtor;

g.      the chapter 11 plan or a summary thereof;

h.      the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

i.      the information relevant to the risks posed to claimants under the plan;

j.      the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

k.      the litigation likely to arise in a nonbankruptcy context; and

l.      the tax attributes of a debtor.[17]

---

basis, with the determination being largely within the discretion of the bankruptcy court.") (internal citations omitted); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) (same).

[17]     *In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics is not necessary in every case. *Phx. Petrol.*, 278 B.R. at 393; *U.S. Brass*, 194 B.R. at 425.

27.    The Disclosure Statement contains, among other things, descriptions and summaries of:  (a) classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan; (b) the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness; (c) events leading to these Chapter 11 Cases, including the Debtors' prepetition negotiations and entry into the TSA and the Merger Agreement; (d) certain important effects of confirmation of the Plan; (e) the discharge, releases, exculpations, and injunctions contemplated by the Plan; (f) certain financial information about the Debtors, including financial projections and liquidation and valuation analyses; (g) the statutory requirements for confirming the Plan; (h) certain risk factors Holders of Claims and Interests should consider before voting to accept or reject and the Plan and information regarding alternatives to confirmation of the Plan; (i) certain important disclosures regarding securities laws; and (j) certain U.S. federal income tax consequences of the Plan.

28.    In addition, and as noted above, the Disclosure Statement and the Plan were subject to review and comment by BCEI, the Consenting Noteholders, the Consenting Shareholders, the prepetition secured lenders, the U.S. Trustee, certain other key stakeholders, and their respective advisors.  For the reasons set forth above, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) and should be approved.

## II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.[18]

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

29.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the content of a plan of reorganization, respectively.[19]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

#### 1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

30.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  For a classification structure to satisfy section 1122 of the Bankruptcy Code, substantially similar claims or interests need not be grouped in the same class.[20]

---

[18]  *See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme") (citing *In re Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal citations omitted).

[19]  S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

[20]  *See, e.g., In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

Instead, claims or interests placed in a particular class must be substantially similar to each other.[21] Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[22]

31.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into separate Classes, with Claims and Interests in each class differing from the Claims and Interests in each other class in a legal or factual way or based on other relevant criteria.[23]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.       <u>Class 1</u>:  Other Secured Claims;

b.       <u>Class 2</u>:  Other Priority Claims;

c.       <u>Class 3</u>:  RBL Claims;

d.       <u>Class 4</u>:  Notes Claims;

e.       <u>Class 5</u>:  General Unsecured Claims;

---

[21]    *Id.*

[22]    Courts have identified grounds justifying separate classification, including where members of a class possess different legal rights or there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case" (internal quotation marks omitted)); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

[23]    *See* Plan, Art. III.

f.      Class 6:  Intercompany Claims;

g.      Class 7:  Intercompany Interest;

h.      Class 8:  Existing HPR Interests; and

i.      Class 9:  Section 510(b) Claims.

32.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[24]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[25]  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

33.     For example, the classification scheme distinguishes Holders of the RBL Claims (Class 3) from Holders of Notes Claims (Class 4) because RBL Claims are secured and Notes Claims are unsecured.  Other Priority Claims (Class 2) are classified separately due to their relative priority and required treatment under the Bankruptcy Code.  In addition, the Plan classifies Existing HPR Interests (Class 8) separately from interests that a Debtor holds in another Debtor because the Debtors' ownership structure is dependent upon maintaining the intercompany interests and, therefore, the intercompany interests may be preserved under the Plan for the

---

[24]    *See* Spitzer Declaration ¶ 18.

[25]    *See id.* ¶ 17.

administrative convenience of ensuring the preservation of the Debtors' corporate structure after the Effective Date.[26]

34.    Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

> **2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

35.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy. The Plan satisfies each of these requirements.

> **a.    Designation of Classes of Claims and Equity Interests and Specification of Unimpaired Classes (§ 1123(a)(1)–(2)).**

36.    For the reasons set forth above, Article III of the Plan properly designates Classes of Claims and Interests and identifies each Class of Claims or Interests that are not Impaired under the Plan.

> **b.    Treatment of Impaired Classes (§ 1123(a)(3)).**

37.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

> **c.    Equal Treatment within Classes (§ 1123(a)(4)).**

38.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or

---

[26]    *See id.*

interest agrees to a less favorable treatment of such particular claim or interest." The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, and no party has asserted otherwise.

### d.    Means for Implementation (§ 1123(a)(5)).

39.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides the means by which the Plan will be implemented. Among other things, Article IV of the Plan provides that the Plan:

a.    constitutes a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan;

a.    authorizes the Debtors or the Reorganized Debtors to take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions and Merger;

b.    cancels all notes, instruments, certificates, and other documents evidencing Claims or Interests;

c.    provides an exemption of section 1146(a) of the Bankruptcy Code;

d.    implements the New Organizational Documents;

e.    authorizes the Reorganized Debtors to adopt any agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan;

f.    authorizes the Exit RBL Facility;

g.    authorizes the Reorganized Debtor, BCEI, and/or their respective designee(s) to issue and distribute BCEI Common Stock to the Holders of Allowed Notes Claims in Class 4, and to Holders of Allowed Interests in Class 8;

h.    authorizes the Reorganized Debtors to enter into the New Take Back Notes Indenture with BCEI;

i.    authorizes each Reorganized Debtor to continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership,

or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form;

j.    authorizes vesting of the assets in the Reorganized Debtors;

k.    authorizes and approves the Debtors and Reorganized Debtors to take corporate action;

l.    executes New Organizational Documents;

m.    mandates the disclosure of the identity of the New BCEI Board and officers of the Reorganized Debtors;

n.    assumes all of the D&O Liability Insurance Policies and Indemnification Provisions pursuant to section 365(a) of the Bankruptcy Code;

o.    authorizes the Reorganized Debtors and the New BCEI Board to issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan;

p.    provides for exemption of certain securities law matters;

q.    preserves the Reorganized Debtors' Causes of Actions in accordance with section 1123(b) of the Bankruptcy Code;

r.    authorizes the closing of the Chapter 11 Cases; and

s.    authorizes the payment of all Restructuring Expenses.

40.    The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. The Debtors believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### e.    Issuance of Non-Voting Securities (§ 1123(a)(6)).

41.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. Article IV.E of the Plan provides that the New Organizational Documents will prohibit the issuance of non-voting

BCEI Common Stock, to the extent required under section 1123(a)(6) of the Bankruptcy Code. The relevant New Organizational Documents for the Reorganized Debtors similarly will reflect such prohibition.

**f.        Directors and Officers (§ 1123(a)(7)).**

42.      Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." Pursuant to Article IV.E.7 of the Plan, on the Effective Date, except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Reorganized Debtor on the Effective Date, the terms of the current members of Debtors' boards of directors shall cease. The members of the New BCEI Board and the officers and directors of the Reorganized Debtors, to the extent known, have been disclosed in the Plan Supplement.[27]  On the Effective Date, each of the directors and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such New Organizational Documents.  The selection of the members of the New BCEI Board is consistent with the interests of all Holders of Claims and Interests, and public policy.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

---

[27]   *See Notice of Plan Supplement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, Ex. B.

3.    The   Plan   Complies   with   the   Discretionary   Provisions   of
Section 1123(b) of the Bankruptcy Code.

a.    Overview of the Plan's Compliance with Section 1123(b) of the
Bankruptcy Code.

43.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions
that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of
the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims
or interests; (b) provide for the assumption or rejection of executory contracts and unexpired
leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor
or the estates; and (d) include any other appropriate provision not inconsistent with the applicable
provisions of chapter 11.[28]

44.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically,
under Article II of the Plan, Classes 1, 2, 3, 5 and, potentially, 6 and 7 are Unimpaired because the
Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and
Interests within such Classes.[29]  On the other hand, Classes 4, 8, and 9, and potentially, 6 and 7 are
Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such
Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[30]

45.    In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V of the
Plan provides for the assumption of all Executory Contracts and Unexpired Leases under section
365 of the Bankruptcy Code, except to the extent set forth in the Plan.[31]

---

[28]    *See* 11 U.S.C. § 1123(b)(1)–(3), (6).

[29]    *See* Plan, Art. III.

[30]    *See id.*

[31]    See *id*. at Art. V.A.

b.     **The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

46.     The Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.   These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were a material inducement for parties to enter into the TSA, are overwhelmingly supported by the Debtors and their key stakeholders (including overwhelming support from the Voting Classes), and are consistent with applicable precedent.   Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Combined Notice, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

(i)     **The Debtor Release Is Appropriate.**

47.     The Bankruptcy Code supports the inclusion of debtor releases in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[32] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[33]   In determining whether a debtor release is proper, courts in Delaware and elsewhere generally may consider the following five factors:

---

[32]     *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).   Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."   *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (citation omitted); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).

[33]     *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

a.    whether the non-debtor has made a substantial contribution to the debtor's reorganization;

b.    whether the release is essential to the debtor's reorganization;

c.    agreement by a substantial majority of creditors to support the release;

d.    identity of interest between the debtor and the third party; and

e.    whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[34]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[35]

48.    Article VIII.C of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors and the Reorganized Debtors may have against the Released Parties (the "Debtor Release").[36]

---

[34]    *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[35]    *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[36]    Article I.A.104 of the Plan defines "Released Party" as, collectively, and in each case in its capacity as such: (i)(a) the Debtors; (b) the Reorganized Debtors; (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates; and (d) with respect to each of the foregoing parties in clauses (i)(a) through (i)(c), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals); and (ii) (a) each Holder of a RBL Claim; (b) each Consenting Noteholder; (c) the RBL Agent; (d) each Trustee; (e) the Consenting Shareholders; (f) BCEI; (g) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(f), each of such Entity's current and former Affiliates; and (h) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(g), each of such party's current and former directors, managers, officers, principals, members, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, investment committee members, special committee members, affiliated investment funds or investment vehicles, managed accounts or funds, participants, management companies, fund advisors or managers, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals or advisors; *provided* that for purposes of this definition, in no event shall "Affiliate" include any entity that is not directly or indirectly, controlled by, or under common control with, the party of which such

The Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates, the product of extensive arm's-length negotiations, was critical to obtaining support for the Plan, the TSA, and the Merger Agreement from various constituencies, and in the best interests of the Debtors' estates.  Indeed, the Debtor Release was negotiated in connection with the other terms of the Plan, the TSA, and the Merger Agreement, and is an indispensable component to achieving final resolution of potential disputes that would otherwise negatively affect these Chapter 11 Cases and the available recoveries under the Plan.

49.    *First*, each Released Party has made a substantial contribution to the Debtors' estates.  The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the issues facing the Debtors, but also in giving up material economic interests to ensure the success of the Plan.  For instance, in exchange for the Debtor Release, the Consenting Noteholders not only agreed to support the Plan pursuant to the TSA, but also agreed to equitize their entire Notes Claims. Additionally, BCEI will issue the BCEI Common Stock to be distributed to Holders of Notes Claims and Existing HPR Interests, issue the New Take Back Notes to be distributed to Holders of Notes Claims, and incur the Exit RBL Facility. And, the Holders of RBL Claims have allowed the Debtors to use cash collateral on a consensual basis to effectuate the Debtors' restructuring.  These measures have provided improved liquidity throughout these Chapter 11 Cases, ensure the Reorganized Debtors' go-forward liquidity, and will continue to provide flexibility to the Debtors' after consummation of the Merger and emergence from chapter 11.

---

entity is an affiliate; *provided*, *further*, that any Holder of a Claim or Interest that opts out of, or objects to, the releases contained in the Plan shall not be a "Released Party".

Finally, the Debtors' directors, officers, and other agents, as well as BCEI and the creditors' professionals and other agents, have been instrumental in negotiating, formulating, and implementing the restructuring transactions contemplated by the TSA, the Merger Agreement, and the Plan.

50.    **Second**, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the TSA, the agreement underpinning the entirety of these Chapter 11 Cases.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the restructuring transactions contemplated therein.  Each Released Party contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not have the overwhelming support of voting creditors and be in a position to confirm the Plan and emerge from chapter 11.  The Debtor Release, therefore, is essential to the Debtors' reorganization.

51.    **Third**, no stakeholders have objected to the Debtor Release contained in the Plan. All voting creditors voted to accept the Plan (including the Debtor Release).

52.    **Fourth**, an identity of interest exists between the Debtors and the parties to be released.  Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.  Moreover, with respect to certain of the releases—e.g., those releasing the Debtors' current and former directors, officers, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Reorganized Debtors (and such claims would "ride through" these Chapter 11 Cases and would

be paid in full similarly to all other general unsecured claims, even assuming that the indemnification obligations were not being assumed).  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Reorganized Debtors themselves.

53.     *Fifth*, the Plan provides for meaningful recoveries for all Classes affected by the Debtor Release.  Under the Plan, Allowed General Unsecured Claims will be paid in full.  Holders of Notes Claims, as a Voting Class, have accepted their Plan treatment—i.e., Pro Rata share of BCEI Common Stock and the New Take Back Notes.  Existing HPR Interests likewise have accepted their Plan treatment as a Voting Class—i.e., Pro Rata share of BCEI Common Stock.  That is, the Debtor Releases are supported by all voting creditors.

54.     For these reasons, the Debtor Release is justified, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and satisfies key factors considered by courts in determining whether a debtor release is proper.

### (ii)     The Third-Party Release Is Consensual and Appropriate.

55.     The Plan also provides for the Releasing Parties'[37] release to the extent set forth in

---

[37]   Article I.A.105 of the Plan defines "Releasing Party" as, collectively, and in each case in its capacity as such: (a) each Holder of a RBL Claim; (b) each Consenting Noteholder; (c) the RBL Agent; (d) each Trustee; (e) each Consenting Shareholder; (f) all Holders of Claims or Interests who vote to accept or are deemed to accept the Plan; (g) all Holders of Claims or Interests who are eligible to vote, but abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (h) all Holders of Claims or Interests who vote to reject or are deemed to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (i) with respect to the foregoing clauses (a) through (h), each such Entity and its current and former Affiliates; and (j) with respect to the foregoing clauses (a) through (i), each such party's current and former directors, managers, officers, principals, members, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, investment committee members, special committee members, affiliated investment funds or investment vehicles, managed accounts or funds, participants, management companies, fund advisors or managers, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals or advisors; *provided*, that any Holder of a Claim or Interest that validly opts out of, or objects to, the releases contained in the Plan shall not be a "Releasing Party".

the Plan (the "Third-Party Release").[38]  Courts in this jurisdiction routinely approve such release

provisions if, as here, they are consensual.[39]  Here, parties in interest had ample opportunity to

evaluate and opt out of the Third-Party Release.  For example, stakeholders in the Voting Classes

had notice and opportunity to "opt out" of the Third-Party Release by checking the appropriate

box on the ballot.  Voting stakeholders that retuned a ballot, furthermore, certified that they read

and understood the election they were making in the ballot.  Non-voting stakeholders that are

entitled to opt-out of the Third-Party Release received notice and instructions for doing so in the

Combined Notice.  Such stakeholders could opt-out by merely sending an email to Epiq with a

subject line of "HighPoint – Third-Party Release Election" and a message indicating that such

party in interest does not consent and would like to opt out of the Third-Party Release on or before

the Objection Deadline (i.e., March 11, 2021, at 5:00 p.m. prevailing Eastern time).  Forty-two

parties in interest have exercised their right to opt out of the Third-Party Release.

56.     The Third-Party Release is a critical negotiated term of the Plan.  Without

the Third-Party Release, the Debtors' key stakeholders would not have been willing to fund and

otherwise support the consensual restructuring transactions contemplated by the TSA, support

confirmation of the Plan, and enable the Debtors to emerge from bankruptcy with a delevered

balance sheet while paying their trade and known general unsecured creditors in full.

57.     Each of the Released Parties, as stakeholders and critical participants in

the Debtors' reorganization process, share a common goal with the Debtors in seeing the Plan

---

[38]   *See* Plan, Art. VIII.D.

[39]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release
      that applied to unimpaired holders of claims deemed to accept the plan as consensual); *Spansion*, 426 B.R. at 144
      (same); *Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *Zenith
      Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan); *see also In
      re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018).

succeed.  Further, the Debtors and the Reorganized Debtors are required to indemnify certain of the Released Parties under, among other agreements, their credit facilities and, with respect to officers and members of the boards of directors of the Debtors, certain indemnification agreements. Thus, causes of action against one of the Debtors' indemnitees could create an obligation on behalf of the Debtors and could effectively amount to litigation against the Debtors, depleting assets of the Debtors' estates.  Accordingly, there is an identity of interests between the Debtors and the entities that will benefit from the Third-Party Release.

58.    The Released Parties, including the Consenting Noteholders, Holders of RBL Claims, the RBL Agent, the Consenting Shareholders, the parties' professionals and agents, certain of the Debtors' other key stakeholders, and the Debtors' officers and directors, played an integral role in the formulation and negotiation of the Plan and the transactions contemplated thereby.  As discussed above, the Released Parties have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  These parties have each provided material concessions or contributions to ensure that the Debtors have a consensual and expeditious reorganization.  In particular, the Debtors' officers and directors:  (a) made a substantial and valuable contribution to the Debtors' restructuring and the estates; (b) invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging environment; (c) attended numerous meetings related to the restructuring; (d) met frequently and directed the negotiations that led to the TSA, the Merger Agreement and the Plan; and (e) are entitled to indemnification from the Debtors under state law, organizational documents, and agreements.  Litigation by the Debtors against the Debtors' officers and directors would be a distraction to the Debtors' business and would decrease rather than increase the value of the estates.  The Debtors' restructuring and

the Merger would not have been possible without the Released Parties' support and contributions. Accordingly, the Third-Party Release should be approved.

### (iii)    The Exculpation Provision Is Appropriate.

59.     Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[40]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[41]

60.     The Exculpated Parties[42] have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.

---

[40]  *See Wash. Mut.*, 442 B.R. at 350–51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[41]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (approving a similar exculpation provision as that provided for under the Plan); *Spansion*, 2010 WL 2905001, at *16 (same).

[42]  Article I.A.51 of the Plan defines "Exculpated Parties" as, collectively, each of the following, solely in its capacity as such:  (i)(a) the Debtors; (b) the Reorganized Debtors; (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates; and (d) with respect to each of the foregoing parties in clauses (i)(a) through (i)(c), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the Consenting Noteholders; (b) each Trustee, (c) the Consenting Shareholders; (d) BCEI; (e) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(d), each of such Entity's current and former Affiliates; and (f) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(e), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity Holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

61.     Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.  Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

62.     Here, the Debtors and their officers, directors, and professionals—together with the other Exculpated Parties—actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys near unanimous support from Holders of Claims and Interests entitled to vote.[43]  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the TSA, the Merger Agreement, the Disclosure Statement, the Plan, and related documents in furtherance of the Merger and the restructuring transactions.[44]  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.

---

[43]     *See, e.g.*, Voting Reports, Ex. A.

[44]     *See* Hr'g Tr. 58:18–19, *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ("[T]he debtors did not do this alone; they did it with the help of many others.").

32

63.    Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful reorganization, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[45]

64.    Accordingly, under the circumstances, it is appropriate for the Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[46]

### (iv)    The Injunction Provision Is Appropriate.

65.    The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") merely implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan.  The Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.  Further, the injunction provided for in the Plan is consensual as to any party that did not specifically object thereto.  To the extent the Court finds that the Plan's

---

[45]    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[46]    *See PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and gross negligence exceptions); *In re Indianapolis Downs, LLC*, 486 B.R. at 306 (same).

exculpation and release provisions are appropriate, the Court should approve the Injunction Provision.

### 4. The Plan Complies with Section 1123(d) of the Bankruptcy Code.

66. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

67. The Plan complies with section 1123(d) of the Bankruptcy Code. The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount, if any on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described in Article V of the Plan.[47]

### B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

68. The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code. The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[48] As discussed below, the Debtors

---

[47] Plan Art. V.C.

[48] *See, e.g.*, *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

69.    As discussed in Part I of this Memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

### 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

70.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .
>
> (f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.[49]

71.    As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited votes from the Holders of Allowed Claims in Class 4 and Holders of Interests in Class 8—the only Classes entitled to vote on the Plan.  The Debtors did not solicit votes from Holders of Claims and Interests in Classes 1, 2, 3, 5, 6, 7, or 9 because Holders of such Claims and Interests are either Unimpaired and presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or Impaired and conclusively deemed to have rejected the

---

[49]    11 U.S.C. § 1126(a), (f).

Plan pursuant to section 1126(g) of the Bankruptcy Code.  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims and Interests in Classes 4 and 8 were entitled to vote to accept or reject the Plan.

72.    With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-third in amount and more than one-half in number of allowed claims in such class vote to accept such plan.

73.    As described above, the Classes of Claims and Interests voting to accept the Plan did so in sufficient number and by sufficient amounts as required by the Bankruptcy Code.[50]  Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

**C.    The Plan Is Proposed in Good Faith (§ 1129(a)(3)).**

74.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[51]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[52]

---

[50]    *See* Voting Report, Ex. A.

[51]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[52]    *See, e.g.*, *T-H New Orleans*, 116 F.3d at 802 (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

75.    The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[53] Here, the Plan will enable the Debtors to deleverage their balance sheet, leave operational obligations unimpaired, and position the Reorganized Debtors for long-term success.  Moreover, the Plan is the product of extensive negotiations among the Debtors, creditors, equity holders, merger counterparty, and other key stakeholders.  The Plan's near unanimous support by the Voting Classes is strong evidence that the Plan is likely to succeed.  All non-voting, non-insider creditors are either Unimpaired under the Plan, Impaired but deemed to reject, or have overwhelmingly agreed to their treatment under the Plan.  Finally, the Plan complies with bankruptcy and applicable nonbankruptcy law.  No party has asserted that the Plan does not comply with section 1129(a)(3) of the Bankruptcy Code.

**D.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

76.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent or by the debtor be subject to approval by the Court as reasonable. Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[54]

---

[53]    *See NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

[54]    *See In re Lisanti Foods, Inc.*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

77.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Debtors submit that payment of their professional claims is the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these Chapter 11 Cases, and the Debtors may not pay their professional claims absent Court approval.  Further, all such professional claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.[55]    Article II.A.2 of the Plan, moreover, provides that the Debtors' professionals shall File all final requests for payment of the professional claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such professional claims.

**E.      The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

78.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider. Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[56]    Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which courts have interpreted to mean: (a) experience in the reorganized debtors' business and industry;[57]  (b) experience in financial and

---

[55]    11 U.S.C. §§ 328(a), 330(a)(1)(A).

[56]    11 U.S.C. § 1129(a)(5)(A)(ii).

[57]    *See In re Rusty Jones, Inc.,* 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.,*

management matters;[58] (c) that the debtors and creditors believe control of the entity by the proposed individuals will be beneficial;[59] and (d) does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[60] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[61]

79.    The Plan satisfies section 1129(a)(5) of the Bankruptcy Code.  As described above, in accordance with Article IV.E.7 of the Plan, the members of the New BCEI Board have been disclosed in the Plan Supplement.  As of the Effective Date, and except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Reorganized Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.[62]  Commencing on the Effective Date, each of the directors and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such New Organizational Documents.

---

37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 760 (citing *Toy & Sports*, 37 B.R. at 149–50).

[58]    *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[59]    *See In re Apex Oil Co.*, 118 B.R. 683, 704–05 (Bankr. E.D. Mo. 1990).

[60]    *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[61]    7 *Collier on Bankruptcy* ¶ 1129.02[5][b] (16th ed. 2018).

[62]    *See* Plan, Art. IV.E.7.

Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied. Finally, the Debtors satisfied section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors have or will publicly disclose the identity of all insiders that the Reorganized Debtors will employ or retain in compliance with the Bankruptcy Code in the Plan Supplement.

F.   **The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

80.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

G.   **The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

81.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes,[63] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[64]

---

[63]    *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at \*7; *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[64]    *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"), *aff'd,* 785 F.2d 1033 (5th Cir. 1986); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a

82.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests

test.  As set forth in the Disclosure Statement[65] and the Spitzer Declaration, the Debtors, with the

assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for

members of each Class deemed to reject the Plan.  The projected recoveries for these Classes under

the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7

liquidation.[66]

83.     Significantly, in a hypothetical chapter 7 liquidation, creditors behind the RBL

Claims in priority, such as Holders of General Unsecured Claims —who are Unimpaired in these

Chapter 11 Cases and are paid in full under the Plan—would receive lesser recovery, and would

not be paid in full in a liquidation scenario.  Accordingly, the Plan complies with section

1129(a)(7), and no party has asserted otherwise.

### H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

84.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests must either accept a plan or be unimpaired under a plan.

85.     Of the Impaired classes of Claims and Interests under the Plan, Classes 4 and 8

voted overwhelmingly to accept the Plan.  Holders of Claims and Interests in Classes 6 and 7 are

deemed to have rejected the Plan and thus were not entitled to vote.  While the Plan does not satisfy

section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed

---

determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

[65]    *See* Disclosure Statement, Ex. F.

[66]    *See id.* ¶ 8.

to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

86.      Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.

87.      The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of Allowed General Administrative Claim will receive cash equal to the amount of such Allowed Claim.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of claims specified by 1129(a)(9)(B) are Impaired under the Plan and such

Claims have been paid in the ordinary course. **Third**, Article II.B of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of Section 1129(a)(9)(C) of the Bankruptcy Code. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

### J.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

88.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

89.    Here, Class 4, which is Impaired, voted to accept the Plan independent of any insiders' votes. Thus, the Plan has been accepted by one voting class holding Impaired, non-insider claims with respect to each Debtor. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### K.    The Plan Is Feasible (§ 1129(a)(11)).

90.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation. Specifically, the Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[67] To demonstrate that a plan is feasible, it is

---

[67]    11 U.S.C. § 1129(a)(11).

not necessary for a debtor to guarantee success.[68] Rather, a debtor must provide only a reasonable assurance of success.[69] There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[70] As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

91.    In determining standards of feasibility, courts have identified the following probative factors:

   a.    the adequacy of the capital structure;

   b.    the earning power of the business;

   c.    the economic conditions;

   d.    the ability of management;

   e.    the probability of the continuation of the same management; and

   f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[71]

---

[68]    *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[69]    *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[70]    *See, e.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility"); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[71]    *See, e.g., In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010).

92.    The Plan is feasible.  As set forth in the Spitzer Declaration,[72] BCEI, the Debtors and their advisors have thoroughly analyzed the Reorganized Debtors' ability post-confirmation to meet their obligations under the Plan and continue as a going concern without the need for further financial restructuring.    BCEI's management and their advisors, and the Debtors' management and their advisors, have made significant progress in implementing a business plan that will enable the Reorganized Debtors to capture the anticipated benefits associated with an expanded regional footprint and synergies resulting from the merging of the operations of BCEI and the Debtors.  To properly execute on this business plan, the Plan will deleverage the Debtors' balance sheet by eliminating the Debtors' approximately $625 million of funded debt.

93.    Moreover, as set forth in the Disclosure Statement, the Debtors prepared projections (the "Financial Projections) of the Combined Company's (as defined therein) financial performance through December 31, 2025.[73] These Financial Projections reflect a series of realistic assumptions regarding the Combined Company and its industry.   The detailed projections demonstrate the Reorganized Debtors' ability to generate sufficient cash to meet ongoing financial obligations of the business and otherwise meet their obligations under the Plan.  On the basis of these projections, which were prepared by the BCEI and its advisors, with the assistance of the Debtors and their advisors, working closely together over several months, the Debtors believe their financial future, taking into account the provisions of the Plan, is sound.

94.    In addition, upon the Effective Date, the Debtors expect to have sufficient funds to make all payments contemplated by the Plan.  The Debtors, along with their professionals, have closely evaluated their cash situation to ensure that they will be able to make all Plan payments

---

[72]    *See* Spitzer Declaration ¶¶ 40 - 42.

[73]    *See* Disclosure Statement, Ex. D.

required on the Effective Date as well as in the months to come.[74]  The Debtors therefore submit that the Plan is feasible and confirmation will not be followed by liquidation.  Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

### L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).

95.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

96.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### M.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)).

97.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits established at any level continue post-confirmation in accordance with section 1114 of the Bankruptcy Code.

98.    The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code because Article IV.E.11 of the Plan provides that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.

---

[74]    *See* Disclosure Statement, Art. VII B 6

**N.      Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

99.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, none of the Debtors is a nonprofit corporation, and, therefore, section 1129(a)(16) of the Bankruptcy Code, which relates only to nonprofit corporations, is not applicable in these Chapter 11 Cases.

**O.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

100.      Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[75]

101.      The Plan satisfies section 1129(b) of the Bankruptcy Code.  The two Impaired Classes of Claims and Interests (Classes 4 and 8) entitled to vote on the Plan overwhelmingly voted to accept the Plan.  Class 9 will receive no recovery and are deemed to reject the Plan.

---

[75]      *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

Classes 6 and 7 may be deemed to reject the Plan based on the Debtors' ultimate determination to maintain or cancel these intercompany claims and interests. Notwithstanding the fact Classes 6, 7, and 9 are deemed to have rejected the Plan, the Plan is confirmable.

      **1.**      **The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

102.      Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[76] In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[77] A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[78]

---

[76]   *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds*, *Bank of Am. Nat. Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[77]   *See In re Coram Healthcare Corp.*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[78]   *See Aleris Int'l*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

103.    Here, certain Classes are deemed to have rejected the Plan.  The Plan's treatment of such Classes is nonetheless proper because all similarly-situated Holders of Claims and Interests will receive substantially similar treatment.  Additionally, the Plan's classification scheme rests on a legally acceptable rationale because it separates substantively dissimilar Claims into separate Classes.

104.    With respect to Classes 6 and 7, the relevant Claims and Interests may be Unimpaired.  These intercompany claims and intercompany interests, which exist to support the Debtors' corporate structure, ultimately may be reinstated because reinstatement of intercompany claims and interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the reorganized Debtors.  This reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

105.    With respect to Class 9 (Section 510(b) Claims), the Debtors do not believe any Section 510(b) Claims exist.  Out of an abundance of caution, the Debtors formed Class 9 to include holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code.  The Plan's treatment of Class 9 is proper because no similarly situated class will receive more favorable treatment.  As there are no holders of Section 510(b) Claims, no distributions should or will be made to Class 9.  No party in interest has asserted otherwise.

106.    Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the deemed rejection by Classes 6, 7, and 9.

**2.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).**

107.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.  This requires either that an impaired rejecting class of claims or interests be paid in full or that a class

junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[79]  Under the Plan, no Holder of a Claim or Interest junior to an impaired rejecting Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest.

108.    Although Intercompany Claims and Intercompany Interests may be reinstated under the Plan and, therefore, would be Unimpaired, such treatment is for the purposes of preserving the Debtors' corporate structure and will have no economic substance.[80]  Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

### P.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (§ 1129(c)–(e)).

109.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.

110.    Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[81]  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental

---

[79]    *See id.*

[80]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. Nov. 24, 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

[81]    *See* 11 U.S.C. § 1129(d).

unit or any other party has requested that the Court decline to confirm the Plan on such grounds.

Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

111.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of

the Debtors' chapter 11 cases is a "small business case."[82]  Thus, the Plan satisfies the Bankruptcy

Code's mandatory confirmation requirements.

### Q.    Good Cause Exists to Waive the Stay of the Confirmation Order.

112.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until

the expiration of 14 days after the entry of the order, unless the court orders otherwise."

Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or

lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits

modification of the imposed stay upon court order.

113.    The Debtors submit that good cause exists for waiving and eliminating any stay of

the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

proposed Confirmation Order will be effective immediately upon its entry.[83]  As noted above,

these Chapter 11 Cases and the related Plan transactions have been negotiated and implemented

in good faith and with a high degree of transparency and public dissemination of information.

Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and

---

[82]    *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,490,925[] (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

[83]    *See, e.g.*, *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re GSE Envtl., Inc.*, No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same).

professional costs, which will be significantly reduced if the Debtors emerge expeditiously. Similar waivers have been approved in comparable, prepackaged chapter 11 cases in this Court.[84]

114.    For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the restructuring transactions so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## **CONCLUSION**

115.    For all of the reasons set forth herein, in the Spitzer Declaration, in the Knupp Declaration, and in the Voting Report, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank.*]

---

[84]  See, e.g., *In re Longview Power*, *LLC,* No. 20-10951 (BLS) (Bankr. D. Del. May. 22, 2020) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020) (same); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 17, 2019) (same); *In re Blackhawk Mining, LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. June 20, 2019) (same). Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

Dated: March 14, 2021

Wilmington, Delaware

*/s/ Domenic E. Pacitti*

**KLEHR HARRISON HARVEY BRANZBURG LLP**

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801

Telephone:         (302) 426-1189
Facsimile:         (302) 426-9193
Email:             dpacitti@klehr.com

- and -

Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:         (215) 569-3007
Facsimile:         (215) 568-6603
Email:             mbranzburg@klehr.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:         (212) 446-4800
Facsimile:         (212) 446-4900
Email:             joshua.sussberg@kirkland.com

- and -

W. Benjamin Winger (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:         (312) 862-2000
Facsimile:         (312) 862-2200
Email:             benjamin.winger@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*