## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHPOINT RESOURCES CORP., *et al.*,[1] | ) | Case No. 21-10565 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### DECLARATION OF STEPHEN SPITZER IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

I, Stephen Spitzer, hereby declare under penalty of perjury as follows:

### Background and Qualifications

1.      I am a Managing Director at AlixPartners, LLP ("AlixPartners"), a position I have held since 2017, and serve as financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I have more than 20 years of corporate finance, advisory, and restructuring experience including establishing financial control policies and procedures, developing long range business plans, designing management reporting tools, and creating liquidity forecasts.  Since joining AlixPartners, I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions, both in chapter 11 and on an out-of-court basis,  for  companies  in  the  energy,  chemical,  manufacturing,  technology,  media,  and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HighPoint Resources Corporation (0361); HighPoint Operating Corporation (0545); and Fifth Pocket Production, LLC (8360).  The location of the Debtors' principal place of business is 555 17th Street, Suite 3700 Denver, Colorado 80202.

telecommunications industries.  As an advisor, I have been involved in a number of chapter 11 cases, including Bruin E&P LLC., Lonestar Resources USA Inc., Charys, Inc., Hexion, Inc., and Sungevity, Inc.

3.      AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing financial advisory services and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these Chapter 11 Cases.  Since its inception in 1981, AlixPartners has provided restructuring or crisis management services in numerous large cases, including services targeted at restructuring, stabilizing, and improving a company's financial position.

4.      I submit this declaration (this "Declaration") in support of the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* dated as of February 10, 2021, filed contemporaneously herewith (as modified, amended, or supplemented from time to time in accordance with its terms, the "Plan").[2]

5.      Since October 5, 2020, AlixPartners has been one of the principal advisors to the Debtors.[3]  Members of my team and I have been directly involved in the matters leading up to the Debtor's chapter 11 filings, which includes the Merger Agreement, TSA, and Plan negotiation process, and developing and implementing the restructuring transactions contemplated thereunder.

6.      I have previously submitted declarations in connection with plan confirmation proceedings, including with respect to the best interests test.

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

[3]      The Debtors executed an engagement letter with AlixPartners on October 5, 2020.

7.    I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

8.    The statements in this Declaration are, except where specifically noted or otherwise stated herein, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of AlixPartners working directly with me or under my supervision or direction, or from the Debtors' books and records maintained in the ordinary course of their businesses.  If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

9.    Neither AlixPartners nor I are being specifically compensated for this testimony other than through payments received by AlixPartners as a professional that the Debtors will seek approval to retain from the United States Bankruptcy Court for the District of Delaware pursuant to an application.

### The Debtors' Need to Quickly Emerge from Chapter 11

10.    The Debtors are seeking to confirm the Plan on March 18, 2021.  As further described in the Declaration of William Crawford, Chief Financial Officer of HighPoint Resources Corp., in Support of Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith, it is in the best interest of the estates that the Debtors remain in bankruptcy for as short a time period as possible.

11.    The Debtors have proactively reached out to their creditors and other parties in interest to explain the proposed restructuring and anticipated timeline of these prepackaged chapter 11 cases.  As described in the First Day Declaration, on February 10, 2021, the Debtors commenced solicitation of votes on the Plan and provided actual notice of the Plan and the Disclosure Statement to voting creditors, their top thirty general unsecured creditors, interested

government parties, and core notice parties.  On February 10, 2021, the Debtors provided a notice to approximately 5,000 creditors and other interested parties of the Debtors' intention to proceed with confirmation of the Plan on or about March 17, 2021, directing parties to the public case website maintained by the Debtors' notice and balloting agent, Epiq, to review the Plan and Disclosure Statement, and providing parties with detailed instructions on how they could object to the Plan.  The Plan, the Disclosure Statement, and the proposed forms of all first-day pleadings were all posted to Epiq's public website.  Finally, it is my understanding that counsel for the Debtors engaged with the Office of the U.S. Trustee for the District of Delaware (the "U.S. Trustee") to notify them of the proposed restructuring and anticipated timeline, as well as address any potential concerns.

12.    In addition to these efforts, the Debtors have also taken all appropriate procedural steps to provide sufficient notice to all stakeholders of their bankruptcy and the confirmation of their Plan.

13.    Specifically, the Debtors have taken the following actions to provide notice:

- On February 10, 2021, the Debtors launched solicitation of the Plan and mailed the Solicitation Packages to all Voting Parties.

- On February 10, 2021, the Debtors posted the Combined Notice, Plan, and Disclosure Statement to Epiq's public website.

- On February 10, 2021, the Debtors served the Combined Notice, Plan, and Disclosure Statement on certain parties in interest.

- On February 16, 2021, the Combined Notice was published in the *The New York Times*.

- On February 16, 2021, the Combined Notice was published in the *The Denver Post*.

- On March 2, 2021, the Debtors posted the proposed forms of all first-day pleadings to Epiq's public website and served notice of proposed forms of all first-day pleadings to the parties that were served the Combined Notice.

- On March 4, 2021, the Debtors posted the Plan Supplement and the Cure Notice with attached Cure Schedule to Epiq's public website.

- On March 4, 2021, the Debtors served notice of posting of the Plan Supplement to the parties that were served the Combined Notice and customized forms of the Cure Notice to each counterparty to an executory contract or unexpired lease, with the applicable contract and proposed cure amount set forth on the Cure Schedule, that may be assumed under the Plan together with the relevant deadline and procedures for objecting to the Plan and/or any such potential assumption or assumption and assignment.

14.     Preserving value for the benefit of the Debtors' estates depends, in large part, on the Debtors proceeding swiftly to confirmation of the Plan and emergence from chapter 11.  For example, the Debtors entered into certain amended ISDA agreements with its hedge counterparties to waive their termination rights for 10 business days.  If the Plan is not confirmed within that timeframe, the counterparties could exercise remedies which could materially impact the liquidity of the Debtors.  The Debtors will likewise save on incremental professional fees and other administrative costs associated with administering Chapter 11 cases as a result of emerging by April 2, 2021.

15.     Given the extensive notice provided to stakeholders, the extensive prepetition outreach to interested parties, the limited amount of written or informal objections by parties in interest, and the overwhelming support for the Plan, the facts here justify confirmation of the Plan at the first-day hearing.  Confirmation of the Plan at the first-day hearing and emergence from chapter 11 immediately thereafter would be enormously beneficial to the Debtors and all of their stakeholders.

## The Plan Satisfies the Requirements of Confirmation

16.     For the reasons detailed below and with the assistance of the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan of reorganization.  I have set forth the reasons for such belief below, except where such compliance

is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of other evidence introduced at the Confirmation Hearing.

# I.    THE PLAN FULLY COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE — § 1129(A)(1).

## A.    Proper Classification of Claims and Interests — § 1122.

17.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into nine separate Classes, with each Class comprising Claims or Interests that differ from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria.

17.    Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests. In particular, claims on account of the Debtors' secured credit facilities are classified separately from general unsecured claims because the Debtors' obligations with respect to the former are secured by liens on substantially all assets of the applicable borrowers. In addition, Claims (rights to payment) are classified separately from Interests (representing ownership in the business). Accordingly, I submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

## B.    Designation of Classes of Claims and Equity Interests — § 1123(a)(1).

18.    I understand that Article III of the Plan properly designates Classes of Claims and Interests. The Plan meets this requirement by assigning each Claim and Interest to a Class containing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in such Class.

## C.    Specification of Unimpaired Classes — § 1123(a)(2).

19.    The Plan identifies each Class in Article III that is Unimpaired.

### D.      Treatment of Impaired Classes — § 1123(a)(3).

20.     The Plan sets forth the treatment of each Class in Article III that is Impaired.

### E.      Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).

21.     It is my understanding that Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.

### F.      Means for Implementation — § 1123(a)(5).

22.     I believe that the Plan provides adequate means for implementation.  The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides for the means by which the Plan will be implemented.  Among other things, Article IV of the Plan provides that the Plan:

(i)     constitutes a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan;

(ii)    authorizes the Debtors or the Reorganized Debtors to take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions and Merger;

(iii)   cancels all notes, instruments, certificates, and other documents evidencing Claims or Interests;

(iv)    provides an exemption of section 1146(a) of the Bankruptcy Code;

(v)     implements the New Organizational Documents;

(vi)    authorizes the Reorganized Debtors to adopt any agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan;

(vii)   authorizes the Exit RBL Facility;

(viii)  authorizes the Reorganized Debtor, BCEI, and/or their respective designee(s) to issue and distribute BCEI Common Stock to the Holders of Allowed Notes Claims in Class 4, and to Holders of Allowed Interests in Class 8;

(ix)  authorizes the Reorganized Debtors to enter into the New Take Back Notes Indenture with BCEI;

(x)  authorizes each Reorganized Debtor to continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form;

(xi)  authorizes vesting of the assets in the Reorganized Debtors;

(xii)  authorizes and approves the Debtors and Reorganized Debtors to take corporate action;

(xiii)  mandates the disclosure of the identity of the New BCEI Board and officers of the Reorganized Debtors;

(xiv)  assumes all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code;

(xv)  authorizes the Reorganized Debtors and the New BCEI Board to issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan;

(xvi)  provides for exemption of certain securities law matters;

(xvii)  preserves the Reorganized Debtors' Causes of Actions in accordance with section 1123(b) of the Bankruptcy Code;

(xviii)  authorizes the closing of the Chapter 11 Cases; and

(xix)  authorizes the payment of all Restructuring Expenses.

23.  The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement.  As a result, it is my belief that the Plan satisfies section 1123(a)(5).

**G.  Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).**

24.  I can confirm that Article IV.E.6 of the Plan provides that the Reorganized Debtors' New Organizational Documents shall contain a provision prohibiting the issuance of non-voting

BCEI Common Stock to the extent required by section 1123(a)(6) of the Bankruptcy Code and further, that the New Organizational Documents filed with the Plan Supplement do in fact contain such a prohibition.  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

**H.     Selection of Officers and Directors — § 1123(a)(7).**

25.     I believe that the Plan is consistent with the interests of all stakeholders with respect to the manner of selection of directors to the New BCEI Board.

26.     I can confirm that Article IV.E.7 of the Plan sets forth the structure of the New BCEI Board. Pursuant to Article IV.E.7 of the Plan, on the Effective Date, the terms of the current members of the Debtor's board of directors shall expire, and the New BCEI Board of the Reorganized Debtors will be disclosed in the Plan Supplement. On the Effective Date, each of the directors and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such New Organizational Documents.  The selection of the members of the New BCEI Board is consistent with the interests of all Holders of Claims and Interests, and public policy.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

**I.     The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).**

27.     I believe that the Plan was proposed in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business, and to enable the Debtors to reorganize and achieve a fresh start.  The Plan is the product of extensive arm's length negotiations among the Debtors, lenders, and other key stakeholders.  The Plan's overwhelming support by the Voting Classes is strong evidence that the Plan is likely to succeed.

**J.      Payment of Professional Fees and Expenses Are Subject to Court Approval —
§ 1129(a)(4).**

28.     It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that

certain fees and expenses paid by the plan proponent, by a debtor, or by a person receiving

distributions of property under the plan, be approved by the Court as reasonable or remain subject

to approval by the Court as reasonable.    I can confirm that Professional Fee Claims and

corresponding payments are subject to prior Court approval and the reasonableness requirements

under sections 328 or 330 of the Bankruptcy Code.    Article II.A.2 of the Plan, moreover, provides

that Professionals shall file all final requests for payment of Professional Fee Claims no later than

45 days after the Effective Date, thereby providing an adequate period of time for interested

parties' to review such Professional Fee Claims.

**K.      Compliance with Governance Disclosure Requirements — § 1129(a)(5).**

29.     To the best of my knowledge, the Debtors, to the extent reasonably practicable, will

make all appropriate disclosures regarding the identities and affiliations of all persons proposed to

serve on the New BCEI Board as well as those persons that will serve as officers of the

Reorganized Debtors, in advance of the Confirmation Hearing, to the extent known at that time.

**L.      Governmental Regulatory Approval of Rate Changes — § 1129(a)(6).**

30.     It is my understanding that Section 1129(a)(6) of the Bankruptcy Code permits

confirmation only if any regulatory commission that has or will have jurisdiction over a debtor

after confirmation has approved any rate change (e.g., the price of utility services) provided for in

the plan.    No such rate changes are provided for in the Plan.

**M.      Best Interests Test — § 1129(a)(7).**

31.     It is my understanding that section 1129(a)(7) of the Bankruptcy Code requires that

each holder of an impaired claim or interest either (a) accept the Plan or (b) receive or retain under

the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is known as the "best interests" test.

32.     In order to determine whether the Plan satisfies the best interests test, the Debtors, with the assistance of AlixPartners, prepared a liquidation analysis, which is attached to the Disclosure Statement, as Exhibit F (the "Liquidation Analysis"). I personally oversaw the preparation of the Liquidation Analysis, and worked closely with a team of AlixPartners staff in its development. The Liquidation Analysis was completed following due diligence performed by the AlixPartners team, including a review of the Debtors' books and records and discussions with the Debtors' management, and was based on a variety of assumptions that I believe are reasonable.

33.     The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical conversion to chapter 7 of the Bankruptcy Code on or about March 31, 2021 (the "Liquidation Date"), with the estimated recoveries to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the estimated value of the Debtors' assets and liabilities as of the Liquidation Date in a forced sale by a chapter 7 trustee, and incorporates various estimates and assumptions, including the projected costs associated with the administrations of the estate and the support required to wind-down of the Debtors' operations in a hypothetical conversion to a chapter 7 liquidation. Further, the assumptions contained within the Liquidation Analysis are subject to potentially material changes, including with respect to economic and business conditions as well as legal rulings.

34.     Estimated Plan recoveries were determined, where applicable, based on the valuation analysis prepared by Tudor, Pickering, Holt & Co. and Perella Weinberg Partners, which is attached to the Disclosure Statement as Exhibit E (the "Valuation Analysis") and described in

the *Declaration of Jeffrey Knupp in Support of Confirmation of the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Knupp Declaration") filed contemporaneously herewith.  The Valuation Analysis ascribes an estimated range of values to the equity in the Reorganized Debtors to be distributed to certain Holders of Claims and Interests under the Plan.  Specifically, the projected recoveries under the Plan and the results of the Debtors' Liquidation Analysis for all Holders of Claims and Interests are as follows:

| Class | Claims and Interests | Plan Recovery | Liquidation Analysis Recovery (Range) |
|---|---|---|---|
| Class 1 | Other Secured Claims | 100% | 100% |
| Class 2 | Other Priority Claims | 100% | 100% |
| Class 3 | RBL Claims | 100% | 100% |
| Class 4 | Notes Claims | 48% - 62% | 20% - 26% |
| Class 5 | General Unsecured Claims | 100% | 20% - 26% |
| Class 6 | Intercompany Claims | 0% / 100% | 0% / 100% |
| Class 7 | Intercompany Interests | 0% / 100% | 0% / 100% |
| Class 8 | Existing HPR Interests | Implied value of $22.19 - $31.99 per share of BCEI Common Stock[4] | 0% |
| Class 9 | Section 510(b) Claims | 0% | 0% |

35.     A comparison of the range of projected recoveries under the Liquidation Analysis to the estimated Plan recoveries indicates that each holder of an Impaired Claim or Interest will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the

---

[4]    Based on pro forma amount of 30,638,863 shares of BCEI Common Stock outstanding after giving effect to the Plan.

Bankruptcy Code.  This is true even at the high end of the range of projected recoveries under the Liquidation Analysis.  In a liquidation, Holders of Notes Claims in Class 4 and General Unsecured Creditors in Class 5 receive recoveries of between 20% and 26%.  Existing HPR Interests in Class 8 would receive no recovery in a liquidation.  Based on the Debtors' and their advisors' Plan valuation and recoveries set forth in the Plan, the Disclosure Statement, the Liquidation Analysis and the Valuation Analysis, I believe these liquidation recoveries are substantially lower than the recoveries provided by the Plan.

36.    Accordingly, it is my professional opinion that the Plan is in the best interests of creditors, interest holders, and all parties-in-interest, and that it satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**N.    Classes Unimpaired Under or Accepting the Plan — § 1129(a)(8).**

37.    It is my understanding that of the Impaired Classes of Claims under the Plan, Class 4 Notes Claims and Class 8 Existing HPR Interests voted overwhelmingly to accept the Plan. Holders of Claims in Class 9 are deemed to have rejected the Plan and thus were not entitled to vote.  It is also my understanding that the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject, but is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

**O.    Priority Cash Payments — § 1129(a)(9).**

38.    It is my understanding that the Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment.  I can confirm that the Plan provides that each Holder of an Allowed General Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time

defined in Article II.A of the Plan.  In addition, no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.  Finally, the Plan specifically provides that each Holder of Allowed Priority Tax Claims shall be paid in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**P.      Impaired Accepting Class of Claims — § 1129(a)(10).**

39.      It is my understanding that the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  It is my understanding that Holders of Claims in Class 4 and Class 8—which are Impaired Classes under the Plan—voted overwhelmingly to accept the Plan independent of any insiders' votes.

**Q.      The Plan Is Feasible — § 1129(a)(11).**

40.      It is my understanding that section 1129(a)(11) of the United States Bankruptcy Code (the "Bankruptcy Code") requires that confirmation of a plan not be likely to be followed by the liquidation or need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.  This is commonly referred to as the requirement that the plan be "feasible."

41.      In connection with proposing the Plan and presenting the Plan to the Court for Confirmation, the Debtors thoroughly analyzed their ability to meet their respective obligations under the Plan and to continue as a going concern without the need for further financial restructuring.  As set forth in the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), BCEI management and their advisors, with input from the Debtors'

management and their advisors, prepared projections related to the financial performance of the combined BCEI and Debtor entities for the 10 month period ending December 31, 2021 and for the fiscal years 2022 through 2025 (the "Financial Projections").  I have reviewed the Financial Projections, understand how they were prepared and the underlying methodology, and agree with the approach and assumptions employed.  The Financial Projections, which are attached to the Disclosure Statement as Exhibit D, were prepared assuming an Effective Date on or around February 26, 2021 and implementation of the Plan in accordance with its stated terms.

42.      I believe that the Financial Projections included in the Disclosure Statement demonstrate that the Reorganized Debtors will be well-positioned when they emerge from bankruptcy to execute their business plan and to service their debt obligations.   Accordingly, I believe that the Plan is feasible and satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**R.      The Plan Provides for Payment of All Fees — § 1129(a)(12).**

43.      Article XII.C of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## II.      THE PRINCIPAL PURPOSE OF THE PLAN IS NOT THE AVOIDANCE OF TAXES AS REQUIRED UNDER SECTION 1129(D) OF THE BANKRUPTCY CODE.

44.      The Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.  Moreover, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Rather, I believe the Debtors filed the Plan

to accomplish their objective of efficiently and responsibly reorganizing their capital structure and providing recoveries to their stakeholders.

## III.   THE PLAN APPROPRIATELY INCLUDES RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.

45.    I understand the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  These provisions are the product of extensive good faith, arm's-length negotiations, were a material inducement for parties to enter into the TSA, and are overwhelmingly supported by the Debtors and their key stakeholders (including significant support from the Voting Classes).

### A.   The Debtor Releases and Consensual Third-Party Releases Are Appropriate.

46.    The Plan includes a release of Estate claims and Causes of Action by the Debtors (the "Debtors' Releases").  I believe that the Debtors' Releases are appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan.  The Debtors' Releases release the Released Parties, from, among other things, any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors.  The Released Parties made significant concessions and contributions to these Chapter 11 Cases in exchange for the Debtors' Releases.

47.    Moreover, based on the Debtors' analysis, the Debtors' Releases greatly benefit the Debtors' Estates, and the probability of success in litigation with respect to claims the Debtors may have against each of the Released Parties is low.  Any potential claims against the Released Parties are exceedingly complex and, even if successful, may be difficult to collect in light of the sophisticated nature of the underlying transactions and certain structural barriers.  The Voting Classes have overwhelmingly voted in favor of the Plan, which includes the Debtors' Releases. Finally, the Plan, including the Debtors' Releases, was heavily negotiated by sophisticated entities

16

that were represented by able counsel and financial advisors. I believe that the result is a compromise that reflects the give-and-take of a true arm's length negotiation process.

48.     Further, I believe that the Debtors' Releases provide the Debtors and the Released Parties with a substantial level of finality upon which to build a fresh start. Moreover, the Debtors' Releases are a central component of the restructuring and are key to bringing the core parties to the deal. In return, under the terms of the Merger Agreement, the TSA and the Plan, the Debtors will eliminate over $625 million of funded debt obligations from the Debtors' balance sheet and minimize the administration expense to the Debtors by seeking an expedited confirmation schedule. This result would be impossible without the concessions of the Released Parties embodied in the Plan. These contributions enabled the successful administration of these Chapter 11 Cases and will facilitate the Debtors' emergence from these Chapter 11 Cases and avoid potentially costly and time-consuming litigation. Accordingly, I believe that the Debtors' Releases are fair, equitable, and in the best interest of the Debtors and their estates.

49.     Article VIII.D of the Plan also contains a third-party release provision (the "Third-Party Release"). It provides that each Releasing Party—including all Holders of Claims that do not specifically opt out of their inclusion as a Releasing Party or object to the Third-Party Release—shall release any and all Causes of Action (including a list of specifically enumerated claims) such parties could assert against the Debtors, the Reorganized Debtors, and the Released Parties.[5] Further, the Third-Party Release is consensual as parties were given the opportunity to opt-out and the Debtors have agreed to carve out all parties that specifically objected (whether formally or informally) to their inclusion as a Releasing Party under the Third-Party

---

[5]     The foregoing description is meant as a summary of the operative plan provisions only. Certain of the Releasing Parties are defined as such in multiple capacities. To the extent there is any conflict between the foregoing summary and the definition of "Releasing Party" contained in Article I of the Plan, the Plan shall control.

Release.  The Third-Party Release is integral to the Plan and a condition of the comprehensive settlement embodied therein.  Thus, I believe that the Third-Party Release allows the Debtors to obtain the finality it needs by minimizing the potential for distracting post-emergence litigation or other disputes.

50.    The Third-Party Release was also given for consideration.  Holders of General Unsecured Claims will be paid in full or otherwise Unimpaired under the Plan.  The contributions of all of the Released Parties will allow the Debtors to continue their businesses as a going concern, despite challenging operating conditions, and maximize value to all stakeholders.  The Third-Party Release contained in the Plan has the consent of the Debtors and the Releasing Parties and is in the best interest of the Debtors' Estates.

**B.    The Exculpation Provision Is Appropriate.**

51.    Article VIII.E of the Plan provides that each Exculpated Party shall be released and exculpated from any Cause of Action arising out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation Provision").[6]  The Exculpated Parties include among others, the Debtors, the Consenting Noteholders, the Consenting Shareholders, and each current and former affiliate of each of the aforementioned entities.

52.    Here, in addition to the Debtors, each of the Debtors' exculpated related parties— including the current and former directors, managers, officers, and advisors that have acted on the

---

[6]    The foregoing description is a summary of the operative plan provisions only.  To the extent there is any conflict between the foregoing summary and the definition of "Exculpated Party" contained in Article I of the Plan, the Plan shall control.

Debtors' behalf in these Chapter 11 Cases—owe duties in favor of the Debtors' estates.[7] The directors, managers, officers, and other agents and advisors (a) have made substantial and valuable contributions to the Debtors' restructuring and the estates; (b) have invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging environment; (c) have met frequently and directed the restructuring negotiations that led to the entry into the TSA and support of the Plan; and (d) are entitled to indemnification from the Debtors under state law, organizational documents, and agreements. The releases of the directors, officers, members, managers, and other agents and advisors contained in the Plan have the consent of the Debtors and the Releasing Parties and are in the best interests of the estates.

53.     The Exculpation Provision and its extension to the Consenting Noteholders, the Consenting Shareholders, and their respective related parties was a critical component of the TSA negotiations. Each of these parties actively participated in good faith in the negotiation of the TSA and the Plan and related restructuring transactions that are subject to approval by the Court. The Exculpation Provision represents a critical piece of the overall agreement reached between the Debtors and the other TSA parties that facilitated a fully-consensual restructuring.

54.     I can confirm that the Exculpation Provision represents an integral piece of the overall settlement embodied by the Plan and is the product of good faith, arm's-length negotiations. The Exculpation Provision ultimately inures to the benefit only of those parties that supported and participated in negotiation of the TSA, the Plan, and the restructuring transactions. I believe the Exculpation Provision should be approved.

**C.    The Injunction Provision is Appropriate.**

---

[7]    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

55.    I can confirm the  injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") merely implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan.  The Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.  Further, the injunction provided for in the Plan is consensual as to any party that did not specifically object thereto.  I believe Injunction Provision should be approved.

**D.     Good Cause Exists to Waive the Stay of the Confirmation Order.**

56.    I understand that Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."  I also understand that Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  It is my understanding that each rule also permits modification of the imposed stay upon court order.

57.    I can confirm that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.  These chapter 11 cases and the related Plan transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  Further, due to the nature

of their business, which operates in a highly competitive environment, the Debtors have a critical and unique need to emerge from chapter 11 expeditiously.

58.     For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the restructuring transactions so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing Declaration are true and correct to the best of my knowledge, information, and belief.

Dated:  March 14, 2021

*/s/ Stephen Spitzer*

Stephen Spitzer
Managing Director
AlixPartners
909 Third Avenue 30th Floor,
New York NY 10022